725 F.2d 293
 11 Bankr.Ct.Dec. 953, Bankr. L. Rep. P 69,722
 In the Matter of AWECO, INC., Debtor.
UNITED STATES of America, (Internal Revenue Service and
Department of Energy), Plaintiffs-Appellants,
v.
AWECO, INC., Debtor-Appellee,
and
United American Car Company, Appellee.
 No. 82-1621.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 21, 1984.
Rehearing and Rehearing En Banc Denied April 23, 1984.
 
 Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Chief, Appellate Section, Wynette J. Hewett, Elaine Ferris, Dept. of Justice, Tax Div., Washington, D.C., for plaintiffs-appellants.
 Alfred L. Ruebel, James S. Mahon, Dallas, Tex., for AWECO, Inc.
 Robert D. Albergotti, Dallas, Tex., for Unsecured Creditors Committee of AWECO, Inc.
 King & Spalding, Frank C. Jones, Walter W. Driver, Jr., Atlanta, Ga., for United-American Car Co.
 Robin Phelan, Dallas, Tex., for Unsecured Creditors Comm.
 Appeal from the United States District Court for the Northern District of Texas.
 Before GOLDBERG, GEE and TATE, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 In this case principles of fairness and equity surface to point to the right result, even as we move through a field of law as narrow and arcane as bankruptcy. Bankruptcy decisions are often judgmental, but, they are factually oriented. In settling a lawsuit, the debtor in this case acted with the approval of the bankruptcy court, and disbursed a very significant portion of its estate to one of its unsecured, nonpriority creditors. The district court affirmed the action of the bankruptcy court. The government, as a priority creditor, claims that the bankruptcy court approved the settlement without sufficient facts to determine the payout's fairness to the government. We agree and vacate the district court's affirmance, remanding for the taking of further evidence on the settlement's fairness.
 
 I. BACKGROUND
 
 2
 This appeal involves three parties: AWECO, Inc., United American Car Co. ("United") and the United States. Debtor, AWECO is engaged in various ventures, primarily in the oil and gas business. In early 1981, AWECO filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.[1] AWECO filed a plan of reorganization several months later, but, the plan was never presented to creditors for approval nor submitted to the court for confirmation. Four of AWECO's creditors, the Department of Energy, the IRS, Sutton Investments, Inc. ("Sutton") and United[2], have at one time or another been involved in these proceedings. The Department of Energy holds an unsecured claim for $45,000,000 based on its determination that AWECO overcharged its customers for certain crude oil the company sold. The IRS has two priority tax claims,[3] one from 1979 in the amount of $4,088,718.08, and one from 1980 in the amount of $2,058,495.50. Sutton's claim is for $7,577,584.98 and is secured by a judgment lien on certain of AWECO's assets.
 
 
 3
 United's claim, the settlement of which produced the instant appeal, is an unsecured, unliquidated claim for approximately $27 million. This claim, asserted in a lawsuit in the United States District Court for the Northern District of Georgia, stems from two contracts between United and AWECO. In these contracts, AWECO agreed to purchase approximately $40 million worth of railroad cars from United. AWECO refused to perform and United sued for breach of contract. United later amended its complaint to include allegations of fraud, asserting the $27 million damage figure.[4] After two years of litigation and while AWECO's Chapter 11 petition was pending, United and AWECO reached a negotiated settlement of the lawsuit. The settlement called for the transfer from AWECO to United of some $5.3 million worth of cash and property. The assets to be transferred included property that secured the Sutton claim, and according to the IRS, secured the larger of its tax claims.
 
 
 4
 In early November of 1981, AWECO filed notice with the bankruptcy court of its intention to settle the litigation. The Department of Energy, the IRS, Sutton and the Creditors' Committee all filed objections to the proposed settlement. The bankruptcy court held a hearing on December 30, 1981, to consider the objections. At the outset of the hearing, the Creditors' Committee withdrew its objections, but the Department of Energy, the IRS and Sutton[5] continued their opposition to the settlement. The court heard testimony from four witnesses: AWECO's president, the court-appointed examiner, the debtor's comptroller and accountant, and an attorney representing United in the Georgia litigation with AWECO.
 
 
 5
 Part of the testimony focused on the fairness of the settlement as between United and AWECO. United's counsel testified regarding the reasons United was willing to accept $5.3 million on its claim of $27 million. By reselling the railroad cars, United had been able to recoup enough of its losses to reduce the claim to $17.4 million. In addition, United wished to avoid the delay, risk and expense involved in further litigation. Even if it prevailed in the suit, United had no guarantee that it would receive as much as $5.3 million as an unsecured creditor in bankruptcy proceedings. And, United wanted to settle the case so that it could count the settlement proceeds in its 1981 taxable year. The settlement was, in fact, conditioned upon the bankruptcy court's immediate approval.
 
 
 6
 Other testimony evidenced the advantages to AWECO of the settlement. The AWECO attorney involved in the Georgia litigation stated that terminating the litigation would save an estimated $200,000--250,000 in legal expenses of trying the suit; the two years of previous litigation had cost AWECO over $700,000. He also testified as to the weakness of AWECO's primary defense to the suit. AWECO's comptroller declared that the settlement would generate a loss for the company that would carry back to offset $2-2.5 million of tax liability.
 
 
 7
 Most of the remaining testimony centered on the settlement's fairness to creditors other than United. A significant part of that testimony concerned AWECO's interest in a nonoperating oil refinery in Lake Charles, Louisiana. Previous managers had been unable to operate the refinery at a profit. AWECO's president declared that despite the refinery's history and currently deteriorating conditions, AWECO's control of the refinery would lead to profits. He also noted that the Lake Charles refinery formed the basis for a successful reorganization plan. The court-appointed examiner testified as to the refinery's liquidation value, estimating it at $13 million.[6] He admitted that he did not know whether the refinery was encumbered by prior liens. The examiner attributed his lack of knowledge regarding the existence of prior liens to his lack of direct control over the refinery. Counting the $13 million from the refinery, the examiner estimated that the proposed settlement would leave $30 million in the estate. His testimony on specific assets, however, listed properties including the refinery that totaled only $17.5 million in value.
 
 
 8
 At the close of the hearing the bankruptcy court announced it would approve the settlement. On the following day the court issued a written order, finding the settlement "fair and equitable" and "in the best interests of the Debtor, its estate, and its creditors." The court allowed a payment of $1 million to United after ten days and ordered that the final consummation of the settlement take place within a month.
 
 
 9
 The IRS and Department of Energy sought a rehearing. The judge then agreed to hear more testimony, citing doubts concerning the liquidation value of the refinery. Record, Vol. II, pp. 4-5. At the subsequent hearing, AWECO's president estimated that the entire refinery was worth $22 million--that AWECO's 56 2/3% interest would yield the company from $13 to 14 million.[7] The president arrived at the $22 million figure from his participation in sales discussions regarding the refinery. He testified, though, that no offer had been made and $22 million had only been "mentioned." In contrast to his testimony at the initial hearing, he stated that AWECO had no plans to operate the refinery. He declared that the facility would be sold.
 
 
 10
 Government counsel moved for a continuance to develop evidence with respect to the value of the refinery, but the court denied the motion. The court was only willing to grant a government request to submit an appraisal of the facility subsequent to the hearing if United would extend its time limit on confirmation of the settlement. When counsel for United stated that any stay of the court's order approving the settlement would jeopardize the deal, the court denied a stay.
 
 II. APPEAL
 
 11
 The government and Department of Energy then appealed to the district court. Their arguments centered on the settlement's fairness to creditors other than United rather than any doubts regarding fairness between AWECO and United. Rejecting these arguments, the district court affirmed the lower decision. The district judge relied on the fact that the bankruptcy court had taken testimony on the settlement's fairness to creditors. He also cited the bankruptcy judge's knowledge of the case derived from months of presiding over the reorganization proceedings. The district judge concluded that, because testimony at the earlier hearings indicated that a settlement with United would give the debtor its only chance at reorganization, the settlement benefitted all creditors.
 
 
 12
 The IRS now brings this appeal. It asserts that the bankruptcy court abused its discretion in approving the settlement of the unsecured, unliquidated claim. Arguing that the bankruptcy court acted on too little information, the government contends that principles of fairness and equity fell victim to the perceived need for speed in approving the settlement.
 
 
 13
 III. DISCRETION AND THE "FAIR AND EQUITABLE" STANDARD
 
 
 14
 The bankruptcy court derives its authority to approve settlements from Bankruptcy Rule 919(a). The Rule provides that, "on application by the trustee or receiver and after hearing on notice to the creditors as provided in Rule 203(a) and to such persons as the court may designate, the court may approve a compromise or settlement." 11 U.S.C. Rule 919(a). Compromises may be effected separately during reorganization proceedings or in the body of the reorganization plan itself. 6 (part 2) Collier on Bankruptcy, p 8.07 at 1405 (14th ed. 1978). The decision of whether to approve a particular compromise lies within the discretion of the trial judge; an appellate court will reverse only when that discretion has been abused. Matter of Jackson Brewing Co., 624 F.2d 599, 602-03 (5th Cir.1980); see also Matter of Walsh Const., 669 F.2d 1325, 1328 (9th Cir.1982); Matter of Ocobock, 608 F.2d 1358, 1360 (10th Cir.1979); In re Albert Harris, 313 F.2d 447, 449 (6th Cir.1963).
 
 
 15
 The exercise of judicial discretion always carries with it responsibility.The term "discretion" denotes the absence of a hard and fast rule (citations omitted). When invoked as a guide to judicial action, it means a sound discretion, that is to say, a discretion exercised not arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result.
 
 
 16
 Langnes v. Greene, 282 U.S. 531, 541, 51 S.Ct. 243, 247, 75 L.Ed. 520 (1931). With regard to approval of compromises that form part of a plan of reorganization, an even more definite rule limits the exercise of discretion. A court may approve such a compromise or settlement only when it is "fair and equitable." Protective Committee v. Anderson, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968); Matter of Jackson Brewing Co., supra, 624 F.2d at 602. The words "fair and equitable" are terms of art--they mean that "senior interests are entitled to full priority over junior ones." SEC v. American Trailer Rentals Co., 379 U.S. 594, 85 S.Ct. 513, 13 L.Ed.2d 510 (1965); Protective Committee v. Anderson, supra, 390 U.S. at 441, 88 S.Ct. at 1171. If a court approves a settlement as part of a reorganization plan absent reasonable assurance that the settlement accords with the fair and equitable standard, that court has abused its discretion.
 
 
 17
 The facts of this case pose the following question: in the period prior to confirmation of a reorganization plan, must the bankruptcy court apply the fair and equitable standard in considering a priority creditor's objections to a settlement? United argues that the fair and equitable standard should not extend so far, implying that a bankruptcy court should not concern itself with the objection pressed by the government. Citing no authority, United argues that extension of the fair and equitable standard would frustrate the new Bankruptcy Code's policy of "less rigid and formalized procedures." Because classes of claims are not complete in the pre-plan stages of reorganization proceedings, application of the fair and equitable standard would preclude all compromises or settlements prior to a plan of reorganization.
 
 
 18
 We reject United's argument on two grounds. First, the argument is simply not relevant here. An application of the fair and equitable doctrine in this case does not take us as far as United suggests. The limited question that we face is whether the holder of an outstanding senior claim[8] can validly object to a proposed settlement with a junior claimant on the basis that the settlement will keep the senior claimant from being paid in full. The answer to this question has no necessary implications beyond the present, limited context.
 
 
 19
 Second, we find the policy arguments convincing that some extension of the fair and equitable standard is proper. As soon as a debtor files a petition for relief, fair and equitable settlement of creditors' claims becomes a goal of the proceedings. The goal does not suddenly appear during the process of approving a plan of compromise. Moreover, if the standard had no application before confirmation of a reorganization plan, then bankruptcy courts would have the discretion to favor junior classes of creditors so long as the approval of the settlement came before the plan. Regardless of when the compromise is approved, looking only to the fairness of the settlement as between the debtor and the settling claimant contravenes a basic notion of fairness. An estate might be wholly depleted in settlement of junior claims--depriving senior creditors of full payment--and still be fair as between the debtor and the settling creditor. Our understanding of bankruptcy law's underlying policies leads us to make a limited extension of the fair and equitable standard: a bankruptcy court abuses its discretion in approving a settlement with a junior creditor unless the court concludes that priority of payment will be respected as to objecting senior creditors.IV. INFORMED DETERMINATIONS
 
 
 20
 Having ascertained the standard which governs approval of the settlement in this case, we must now decide whether that standard was met. Initially, we note that important determinations in reorganization proceedings must receive the "informed, independent judgment of the Bankruptcy Court." Protective Committee v. Anderson, supra, 390 U.S. at 424, 88 S.Ct. at 1163. The duty of a bankruptcy judge to reach an "intelligent, objective and educated evaluation" of settlements cannot be carried out absent a sufficient factual background. Matter of Jackson Brewing Co., supra, 624 F.2d at 602. This requisite factual background assumes particular importance with respect to determinations hinging on the fair and equitable standard. A decision on whether a settlement with a junior creditor depletes the estate so severely as to endanger senior claims requires full and accurate information about the net value of estate assets.
 
 
 21
 An examination of the record in the case before us reveals gaping holes in the background of information regarding the United-AWECO settlement. Although the court found that $30 million worth of assets would remain in the estate after the settlement, the examiner's testimony as to specific assets totalled only a little over $17 million. Even with respect to the assets that the examiner specifically named, the information before the bankruptcy court was inadequate. The examiner, who put a $13 million tag on AWECO's interest in the Lake Charles refinery, had no experience in estimating liquidation values and no expertise pertaining to oil refineries. The president's $22 million estimate for the value of the whole refinery rested on an unknown party's "mention" of a figure during negotiations. Most importantly, the examiner admitted that he did not know whether the refinery was encumbered by prior liens. The information contained in the record is so incomplete that any valuation of the refinery alone or of the estate as a whole is purely conjectural. In determining the value of the estate, the court failed to play the appropriate "quasi-inquisitorial role." Matter of Boston & Providence R. Corp., 673 F.2d 11 at 12 (1st Cir.1982).
 
 
 22
 Under the facts of this case, which party bears the burden of establishing the estate's value is irrelevant. Even were the burden cast upon the objecting creditor, unsubstantiated, gratuitous declarations regarding an estate's worth cannot support an approval of a settlement. In a railroad reorganization case the First Circuit observed: [In approving compromises] "the court must act independently, out of its own initiative, for the benefit of all creditors. This obligation prevails even where the creditors are silent." Matter of Boston & Providence R. Corp., supra, 673 F.2d 11 (1st Cir.1982); see also Ashbach v. Kirtley, 289 F.2d 159, 166 (8th Cir.1961). We agree. An approval of a compromise, absent a sufficient factual foundation, inherently constitutes an abuse of discretion.
 
 
 23
 Given the nature of settlements and of this one in particular, it is not difficult to understand the dearth of information. United exerted pressure upon AWECO to gain approval of the settlement quickly, lest United lose the tax advantage that provided part of the settlement's consideration. Time pressure apparently influenced the bankruptcy judge to deny the government's request for a continuance to develop evidence on the refinery's worth and to deny the government leave to submit its own appraisal of the refinery. In an analogous situation in Protective Committee v. Anderson, supra, 390 U.S. at 450, 88 S.Ct. at 1176, the Supreme Court voiced its sympathy with the desire of a court to terminate protracted bankruptcy proceedings. However, the Court observed that, "the need for expedition is not a justification for abandoning proper standards." Id. We also sympathize with the bankruptcy judge who has suffered the travails of months filled with the problems of the debtor and its creditors. We acknowledge the principle that justice delayed is justice denied. Moreover, preserving a settlement potentially advantageous to the debtor and its creditors is a worthy goal. Nevertheless, the circumstances below, surrounding approval of this settlement, called for a pause. Proof of value must find expression in definite numbers, not figures merely opined, mentioned or guessed. The bankruptcy judge should not reach for his stamp marked "approved" unless some party supplies concrete facts.
 
 V. CONCLUSION
 
 24
 The terms "equity" and "fairness" are not only terms of art in bankruptcy--they are catch words of bankruptcy law in general. Equitable considerations should be preeminent in the exercise of bankruptcy jurisdiction. See Bank of Marin v. England, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966); see also Demet v. Harralson, 399 F.2d 35, 39 (5th Cir.1968). Furthermore, decisions as central to bankruptcy proceedings as approval of settlements cannot be visceral. They must issue from reason and rest upon factual undergirdings.
 
 
 25
 In this case time pressure functioned as a shotgun. The bankruptcy court blessed the settlement without sufficient factual information to determine if the settlement was fair and equitable to the government. Our purpose in annulling that blessing is to assure that factually unsupported approvals of settlements do not impose an unfair detriment on creditors; we do not write to radically restrict bankruptcy courts' discretion to approve settlements. Rather, with guidance from today's holding and facts developed from further proceedings we anticipate that the bankruptcy court below can properly exercise its discretion. We therefore vacate the order of the District Court and remand with instructions to return the case to the bankruptcy court for proceedings consistent with this opinion.
 
 
 26
 VACATED and REMANDED.
 
 
 
 [1]
 11 U.S.C. Sec. 1101 et seq
 
 
 [2]
 The debtor's schedules list 27 claims against it
 
 
 [3]
 On appeal an unresolved dispute remains as to whether the larger of the tax claims is secured. Both of the claims, however, have priority status under 11 U.S.C. Sec. 507(a)(6)
 
 
 [4]
 Specifically, United asserted that AWECO falsely represented that it, AWECO, had completed construction of an oil refinery in Lake Charles, Louisiana, and that the refinery showed an annual operating profit of $50 million. Further, the amended complaint alleged that debtor misused corporate funds to benefit the family of the company's president and that AWECO failed to disclose that the company's chairman of the board had been convicted in 1977 of defrauding the First National Bank of Chicago
 
 
 [5]
 Sutton's objection was conditional. The company's concern centered on the displacement of its lien on certain of AWECO's property. Sutton indicated its willingness to withdraw the objection if the court granted it a replacement lien on substituted property of a comparable value. In a December 31, 1981, order the court granted Sutton a replacement lien on "properties of the Debtor not required for and remaining after consummation of the settlement, including, without limitation, real estate, personal property, contract rights, notes and accounts receivable, interest in subsidiaries and joint ventures, and any other assets as to which said lien claimants previously had no lien claim."
 
 
 [6]
 The examiner, an accountant, admitted that he had no experience at estimating liquidation values and that he had no special knowledge concerning oil refineries
 
 
 [7]
 The $13-14 million figure assumes that AWECO receives a certain amount as a return of capital before a split of the other sales proceeds
 
 
 [8]
 We find no dispute below with regard to the government's filing of a proof of claim for approximately $6.1 million