**In re QUALITY BEVERAGE CO., INC., Debtor.**

**Bankruptcy No. 93–48124–H3–11.**

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

March 31, 1995.

Jeffrey A. Shadwick, Liquidating Trustee, Winstead, Secrest & Minick P.C., Houston, TX.

David Weitman, Mark Steirer, Hughes & Luce L.L.P., John T. Mitchell, Little, Pedersen, Fankhauser & Cox L.L.P., Dallas, TX, for NationsBank of Texas, N.A.

Ronald R. Del Vento, Asst. Atty. Gen., State of Tex., Austin, TX, Donald Warshauer, Asst. County Atty., Harris County, Tex., Houston, TX, for State.

Edward L. Ripley, Sheinfeld, Maley & Kay P.C., Houston, TX, for Michael Saragusa.

Susan Mathews, Houston, TX, for Official Unsecured Creditors' Committee.

Keavin McDonald, Bonham, Carrington & Floyd P.C., Houston, TX.

Shawn K. Brown, Burke & Wright P.C., Dallas, TX, for Kendall–Jackson Winery, Ltd., Majestik Marketing Group, Ltd. and Round Hill Estates.

Eloise A. Guzman, Calame, Linebarger, Graham, Pena, Burney, Foreman, Torres & Garza, Houston, TX, for City of Houston.

## MEMORANDUM OPINION

LETITIA Z. CLARK, Bankruptcy Judge.

The court has considered the Joint Motion of NationsBank of Texas, N.A., and the Chapter 11 Trustee for (i) Reconsideration of Order Denying First Claims Allowance Motion Without Prejudice and (ii) Approval of Revised Sharing Agreement as Compromise and Settlement Agreement under Rule 9019 (Docket No. 677) ("Compromise Motion"), and the Motion to Convert Case to Chapter 7 (Docket No. 691) filed by the Texas Alcoholic Beverage Commission and Texas Employment Commission. The following are the Findings of Fact and Conclusions of Law of the court. A separate conforming Judgment will be entered. To the extent any of the Findings of Fact may be considered Conclusions of Law, they are adopted as such. To the extent any of the Conclusions of Law may be considered Findings of Fact, they are adopted as such.

### Findings of Fact

A. *Background*

1. Quality Beverage Company, Inc. ("Debtor") filed its voluntary Chapter 11 petition on October 28, 1993. Debtor continued as a debtor in possession from the petition date until appointment of a Chapter 11 Trustee on November 15, 1995, on motion of NationsBank of Texas, N.A. ("NationsBank") and the Official Committee of Unsecured Creditors ("Committee").

2. Hearings were held on November 10, 1994 and November 15, 1994 on a motion seeking approval of an earlier "sharing agreement" which is substantially similar to the instant agreement. Transcripts of those hearings were admitted into evidence at the hearing on the Compromise Motion. Authorization of the prior agreement was denied without prejudice. (Tr. 11/15/94, Docket No. 667, at p. 4).

3. At the earlier hearing, John W. Hunt, the Chief Financial Officer of the Debtor at the time of the petition, testified that Debtor had decided, early in the history of the bankruptcy case, that it would liquidate rather than reorganize. This decision, Hunt testified, was made as a result of a determination by several of Debtor's prepetition suppliers not to accept return of merchandise sold to Debtor, as well as of the impact of Debtor's largest supplier's hiring away Debtor's sales team. This decision was announced in open court on November 12, 1993, in connection with a hearing on Debtor's request to obtain postpetition financing and to use NationsBank's cash collateral.

4. Jeffrey A. Shadwick, ("Trustee") and NationsBank are now requesting the court to determine that the orders arising from the November 12, 1993 hearing, together with subsequent funding of the Debtor by NationsBank, operate to establish NationsBank's superpriority claim. Trustee and NationsBank have sought approval of their joint "Revised Sharing Agreement", which provides a mechanism for distribution to creditors based on allowance of NationsBank's superpriority claim. The Committee joins in the motion. Texas Alcoholic Beverage Commission ("TABC"), Texas Employment Commission ("TEC"), and other parties in interest have objected to the motion.

5. TABC and TEC have sought conversion to Chapter 7, for the reason that Debtor has long since ceased any attempt to reorganize, and that no liquidating plan is contemplated.

B. *The Agreement*

6. The proposed Revised Sharing Agreement provides for the compromise of several controversies raised by the Committee. Those controversies include the Committee's request for compensation of its counsel and

request that such compensation be allowed as a surcharge against NationsBank's collateral, the Committee's request that this court determine the secured status of NationsBank's claim, and the Committee's request that it be permitted to prosecute on behalf of the estate a fraudulent transfer action against Michael Saragusa.

7. Under the proposed Revised Sharing Agreement, the parties agree as to the value of NationsBank's collateral, and the amount of and secured and superpriority status of NationsBank's claims. The agreement calls for NationsBank to assign the first $650,-000.00 of any proceeds NationsBank receives from preference avoidance actions and recovery of in-kind transfers into an escrow account for a pro-rata distribution to a group of listed unsecured creditors holding scheduled claims, as well as the Committee's professionals. The agreement also calls upon NationsBank to create an escrow for pro-rata distribution to a second group of listed unsecured creditors holding contingent claims as a result of the avoidance actions. The agreement makes no provision for allowance or disallowance of claims, but instead calls for pro-rata disbursements based on the scheduled amounts of the claims.

8. The agreement provides that the case will be converted to Chapter 7, and that Jeffrey Shadwick will be appointed as Chapter 7 Trustee. Shadwick is the present Chapter 11 Trustee. Upon such conversion, NationsBank agrees to provide Shadwick an advance of $100,000.00 on an as-needed basis to cover the expense of prosecuting avoidance actions.

9. The agreement provides for each creditor to assign its claim to the Trustee and/or to NationsBank as a condition of receiving distribution of any of the escrowed funds, and to remit any funds received from Debtor's estate to NationsBank.

10. The agreement calls for a waiver of any claim on which a distribution is made, and on which the check tendered for payment is not negotiated within ninety days.

C. *Objections to Approval of the Agreement*

11. A number of parties oppose the motion. Objections were filed by TABC and

TEC (Docket No. 691), Michael Saragusa (Docket No. 700), Kendall Jackson Winery, Ltd., d/b/a Cambria Vineyards, Majestic Marketing Group, Ltd., and Round Hill Estates ("Kendall") (Docket No. 693), City of Houston (Docket No. 692), and Houston I.S.D., San Antonio I.S.D., Bexar County, City of San Antonio, City of Grand Prairie, Tarrant County, and Jefferson County ("Tax Authorities") (Docket No. 689). Ector County I.S.D., Odessa Junior College District, City of Odessa, and Ector County Hospital District join in the objection of Houston I.S.D., et al. (Docket No. 704). TABC, TEC and Kendall believe the agreement is an attempt to circumvent the plan confirmation process and priorities established in the Bankruptcy Code. The Tax Authorities assert that the agreement fails to take into account possible credits to the estate if NationsBank collects from Michael Saragusa, who made personal guarantys of the NationsBank debt. Michael Saragusa asserts that NationsBank is not entitled to a superpriority claim.

D. *Postpetition Course of Dealings*

12. NationsBank contends that its claim was $14.18 million as of September 30, 1994, and that it has a superpriority claim for at least $4.845 million. NationsBank claims a superpriority debt as a result of "(i) postpetition financing provided by NationsBank to the Debtor under the Financing Order; (ii) the Debtor's use of NationsBank's Cash Collateral as authorized by the First and Second Cash Collateral Orders; and (iii) a post-petition decline in the value of the Debtor's inventory arising from post-petition events." (Compromise Motion, Docket No. 677, at 4).

13. A recounting of the history of prepetition and post-petition arrangements and negotiations between NationsBank and Debtor is useful. Forrest W. McCollum, the Vice President of NationsBank who is responsible for Debtor's account, testified that NationsBank was owed, as of the petition date, approximately $31.6 million, consisting of a revolving loan of approximately $23 million secured by accounts receivable and inventory,

and loans of $5.3 million secured by equipment, and $3 million secured by real estate. McCollum described the loans as cross-collateralized. (Tr. 11/15/94, Docket No. 673, at p. 7).

14. On the date Debtor filed its bankruptcy petition, Debtor also filed several motions, including motions seeking authority to pay prepetition employee compensation, and seeking approval of postpetition financing and authority to use NationsBank's cash collateral.

15. Following a hearing on the Motion for Order Authorizing Payment of Certain Prepetition Obligations in the Ordinary Course of Business and Directing NationsBank to Honor Prepetition Checks for Employee Compensation and Related Expenditures (Docket No. 7), the court entered an order on October 29, 1993 (Docket No. 23) ("Wage Order"), authorizing the payment of prepetition wages in the amount of $794,875.00. The order provides, *inter alia*, that "as to the advances made by NationsBank hereunder to the Debtor to protect against immediate and irreparable harm, NationsBank shall be (i) deemed a good faith lender under 11 U.S.C. § 364(e), and (ii) afforded the protection of a lender who has lent pursuant to 11 U.S.C. § 364(c)."

16. The first hearing on the "Motion for Interim and Final Order Authorizing Debtor-in-Possession Financing and the Use of Cash Collateral and Approving Joint Stipulation and Agreed Order Authorizing Interim Postpetition Financing, Providing for Adequate Protection and Granting Liens and Super-Priority Expense Claim" (Docket No. 12) (the "Financing Motion") was held on November 2, 1993. Interim use of cash collateral was not approved at that time, and a final hearing was set for November 12, 1993. The court on November 2, 1993 noted certain unacceptable provisions in the twenty-eight page form of agreed order submitted by Debtor and NationsBank on the Financing Motion. These unacceptable provisions included retirement of prepetition debt with postpetition income. A revised form of order

was submitted to the court on November 3, 1993. It did not revise all the provisions the court had found unacceptable.

17. An order containing certain revisions by the court was entered on November 9, 1993 (Docket No. 50) ("Financing Order")[1] granting the Financing Motion subject to a provision that a hearing would be held if objections were filed within fifteen days of entry of the order. Objections were filed within the allotted time by the Committee, Heaven Hill Distilleries, Inc., and Michael Saragusa.

18. Debtor then sought a "clarification" of the November 9, 1993 order, on grounds that NationsBank refused to loan under the terms and conditions of the order. (Docket No. 56, at p. 3). Debtor's Motion to Clarify was set for a hearing on November 23, 1993.

19. The court held the final hearing on the Financing Motion, including the so far unapproved portion requesting leave to use cash collateral, on November 12, 1993. At that hearing, counsel for the Debtor announced that the Debtor would not go forward on its request for financing under the Financing Motion, would seek use of cash collateral, and intended to file a liquidating plan. NationsBank had not provided any postpetition financing at that time. What NationsBank had done was to continue to collect Debtor's accounts receivable and cash earned from sales after the date of the petition, and to apply those amounts collected to its prepetition debt. (Testimony of Hunt, Tr. 11/12/93, at p. 34). NationsBank never received court authorization to do so.

20. The Debtor requested immediate use of cash collateral in order to meet the demands of its largest supplier, E & J Gallo Winery ("Gallo"), for guarantees of payment before it shipped any additional merchandise. After testimony by Hunt and lengthy discussions among the parties at the November 12, 1993 hearing, an order was entered. The order (Docket No. 78) ("Interim Cash Collateral Order") authorized Debtor to use up to $2.595 million of NationsBank's cash collater-

1. The order referred to in the Compromise Motion as the "Financing Order" is referred to in this opinion as the "Wage Order".

al to buy inventory and fund necessary expenses to Debtor's closing down of operations. NationsBank was granted a replacement lien on all assets of the Debtor in which NationsBank had a prepetition basis. The order additionally authorized NationsBank to loan up to $2.595 million to Debtor between November 12, 1993 and November 23, 1993 to the extent sufficient cash collateral was unavailable. Repayment of that balance was granted priority pursuant to 11 U.S.C. § 364(c)(1), (c)(2), and (c)(3). The order set a final hearing on November 23, 1993, at the same time as the hearing on the Motion to Clarify.

21. At the November 23, 1993 hearing, Hunt testified that Debtor had been unsuccessful in its attempts to continue doing business with Gallo. In the period between November 12, 1993, and November 23, 1993, Debtor used $788,000.00 in cash collateral, and found it unnecessary to borrow any money pursuant to the authority granted under the Interim Cash Collateral Order (Docket No. 78) (Tr. 11/23/93, at p. 13).

22. It was not demonstrated in the evidence that NationsBank's prepetition position in accounts receivable and proceeds of inventory sales was such as to give NationsBank a postpetition lien on all accounts receivable and proceeds from sales of inventory. The orders on which NationsBank relies gave it no more rights to Debtor's assets postpetition than it had prepetition. In the absence of NationsBank's application of postpetition proceeds to pay prepetition debt, the funds generated by sales of assets and collections from suppliers could have been made available as replacement funds for the cash collateral Debtor used between November 12, 1993 and November 23, 1993.

23. The order (Docket No. 128) arising from the November 23, 1993 hearing ("Final Cash Collateral Order") authorized Debtor to use up to $1,957,465.00 of cash collateral based on its budgeted needs between November 14, 1993 and January 31, 1994. As adequate protection for the use of its cash collateral, NationsBank was granted a replacement lien on all assets of the Debtor in which NationsBank had a prepetition basis. Concurrently with entry of the Final Cash Collateral order, an order was entered denying as moot the Motion to Clarify. The court finds that the Financing Order was superseded by the Interim Cash Collateral Order and the Final Cash Collateral Order.

24. Since entry of the Final Cash Collateral Order, Debtor and NationsBank have entered into and filed with the court four "Joint Stipulations" regarding Debtor's limited use of NationsBank's cash collateral. Pursuant to the four Joint Stipulations, Debtor was permitted to use a total of $824,523.00 of NationsBank's cash collateral. Each stipulation calls for liens granted in the prior cash collateral orders to continue in effect with respect to the cash collateral used.

25. Debtor did file a liquidating plan and a disclosure statement (Docket Nos. 348, 349), and amendments to the plan and disclosure statement (Docket Nos. 413, 414). However, Debtor has put off hearing on the disclosure statement four times, and no party has been able to propose a plan that meets the requirements for confirmation.

26. NationsBank first filed a motion for relief from the automatic stay pursuant to 11 U.S.C. § 362 on April 6, 1994. After several continuances sought by NationsBank were granted, the stay was lifted as to NationsBank and as to the Tax Authorities on November 15, 1994.

27. Debtor's remaining assets include a small amount of inventory and accounts receivable. The other assets remaining include causes of action pending in adversary proceedings before this court seeking to avoid alleged preferences and in-kind transfers to suppliers, as well as the causes of action, if any, which the Committee has previously sought to bring against Michael Saragusa.

*Conclusions of Law*

A. *Compromise*

■ 1. Bankruptcy Courts derive their authority to approve compromises from Rule 9019(a), Federal Rules of Bankruptcy Procedure. That rule provides as follows:

On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trust-

ee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

■ 2. Compromises may be effected separately during reorganization proceedings, or in the body of a reorganization plan. *Matter of AWECO, Inc.*, 725 F.2d 293 (5th Cir.1984) *cert. den.*, 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984).

■ 3. When the compromise forms part of a Chapter 11 plan, the court may approve the plan only if it finds that the compromise proposed therein is fair and equitable. *In re Frontier Airlines*, 117 B.R. 588 (D.Colo. 1990).

■ 4. When a compromise is made prior to consideration of confirmation of a plan, the court must likewise consider whether the compromise is fair, equitable, and in the best interests of the estate. *In re Kaiser Steel Corp.*, 105 B.R. 971 (D.Colo.1989).

■ 5. To make this determination, the court should consider the probable success of the litigation on the merits, any potential difficulty in collection of a judgment, the complexity and expense of the litigation, and the interests of creditors with deference to their reasonable views. *Kaiser Steel*, 105 B.R., at 977; *Protective Committee v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1967).

**B. *Interests of Creditors and the Role of the Committee***

■ 6. Regardless of when a compromise is approved, looking only to the fairness of the settlement as between the debtor and the settling claimants contravenes a basic notion of fairness. *Matter of AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir.1984).

■ 7. While the Committee bears a strong duty to the interests of the unsecured creditors it represents, it has neither the power nor the authority to bind each individual creditor. Collateral estoppel precludes relitigation of issues that were a necessary part of and were actually decided in a prior judgment. *In re Lewisville Properties Inc.*, 849 F.2d 946 (5th Cir.1988).

■ 8. The doctrine of collateral estoppel cannot bind a person who was neither a party nor privy to a prior suit. *In re Corrugated Container Antitrust Litigation*, 756 F.2d 411, 419 (5th Cir.1985).

■ 9. A nonparty is in privity with a party for res judicata purposes if the nonparty has succeeded to the party's interest in property, controlled prior litigation, or if the party adequately represented the interest of the nonparty in the prior proceedings. *Latham v. Wells Fargo Bank., N.A.*, 896 F.2d 979 (5th Cir.1990).

10. The controversies for which the Revised Sharing Agreement is sought to be approved as a compromise are the Committee's request for allowance of attorney compensation as a surcharge against NationsBank's collateral, the Committee's objection to the status alleged by NationsBank of its claim, and the Committee's request that it be permitted to prosecute on behalf of the estate a fraudulent transfer action against Michael Saragusa.

11. The effect of the Revised Sharing Agreement is to provide for the distribution of all of the assets of the estate. Other parties have asserted entitlement to some of the funds at issue. Thus approval of the agreement would substantially affect the rights of all parties to the case, including those holding priority and administrative claims.

12. The court concludes that the interests of those parties are not represented by the Committee.

13. The interests of all creditors are, however, represented by the Chapter 11 Trustee, who has a fiduciary duty to all the creditors of the estate.

14. At the December 19, 1994 hearing on the motion to approve the Revised Sharing Agreement, Trustee stated that his review of the agreement after his appointment on November 15, 1994, had consisted of reading the transcripts of the hearings on the original Sharing Agreement, reviewing the exhibits presented at the hearings, reading several of the cases cited at those hearings, and speaking on the phone with the Committee's accountants. (Tr. 12/19/94, at p. 3). Based on

Trustee's representations, together with the fact that the Revised Sharing Agreement differs from the original agreement only in its procedural posture and its responsiveness to some of the objections raised to the original agreement, the court concludes that the Trustee had not conducted a full independent investigation of the facts and circumstances at the time the Revised Sharing Agreement was heard.

15. The court concludes that the Revised Sharing Agreement was not sufficiently researched by Trustee to represent an exercise of the Trustee's independent business judgment.

### C. *Compliance with the Bankruptcy Code*

16. Because the proposed distribution is not in the ordinary course of business, it is also governed by the provisions of Section 363(b)(1) of the Bankruptcy Code, which provides:

> The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

11 U.S.C. § 363(b)(1).

17. Section 363 does not authorize the Debtor and the court to short-circuit the requirements of Chapter 11 by establishing the terms of a plan *sub rosa* in connection with a proposed transaction. *In re Continental Air Lines,* 780 F.2d 1223 (5th Cir. 1986).

■ 18. There must be an articulated business justification, other than appeasement of major creditors, for the use, sale or lease of estate property outside the ordinary course of business. *In re Lionel Corp.,* 722 F.2d 1063 (2d Cir.1983).

19. In the instant case, the Debtor, Trustee, Committee, and NationsBank have conceded that the Debtor should be liquidated. The remaining disputes go to the issues of avoidance of transfers and the relative priority of claims. The court concludes that there is insufficient business justification for allowing distribution of all the assets of the estate in the manner proposed in the Revised Sharing Agreement.

20. The standards for compromise of controversy differ from those for confirmation of a plan. There are creditors whose interests were not adequately represented in the drafting of the agreement, in particular, the Tax Authorities, TEC, TABC, and Michael Saragusa. There may be others. Neither the Committee nor the Chapter 11 Trustee should be permitted to bind those creditors without the disclosure, claims allowance, and voting safeguards of plan confirmation in Chapter 11.

### D. *The NationsBank Claims*

■ 21. The court finds that the issue of whether NationsBank is entitled to a superpriority claim is properly before the court, as a result of NationsBank's request that the court approve its claim under Section 507(b) (Docket No. 677, at p. 16). Such a claim, like those of the Tax Authorities, counsel for the Committee, and other administrative expense claims which may exist, arises by operation of the Bankruptcy Code, not by agreement of the parties. The claim was objected to by Michael Saragusa.

22. NationsBank has claimed a superpriority debt as a result of post-petition financing provided by NationsBank to the Debtor. The court has previously allowed NationsBank's superpriority claim in the amount of $794,875.00 relating to the payment of employee wages ("Wage Order", at Docket No. 23).

23. NationsBank also claims a superpriority debt under Section 507(b) resulting from Debtor's use of cash collateral and the decline in value of the collateral given as replacement collateral.

■ 24. Except as provided in Section 507(b), claims for administrative expenses enjoy the first priority in distributions from the estate. 11 U.S.C. § 507(a)(1).

25. Section 507(b) provides as follows:
If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(1) of this section arising

from the stay of action against such property under section 362 of this title, from the use, sale, or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.

11 U.S.C. § 507(b).

26. Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among its creditors, statutory priorities are narrowly construed. *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.,* 789 F.2d 98, 100 (2d Cir.1986).

27. It is the claimant's burden to establish its entitlement to priority treatment. *In re O.P.M. Leasing Services, Inc.,* 60 B.R. 679 (Bankr.S.D.N.Y.1986).

28. The items admitted into evidence at the hearing on the Compromise Motion consist of the Revised Sharing Agreement and transcripts of the hearings on the original agreement. The exhibits introduced at the hearing on the original agreement were not introduced at the hearing on the Compromise Motion, and are not in the record.

29. The testimony at the hearings on the original agreement is the best evidence available regarding what cash collateral was used by the Debtor. McCollum testified that NationsBank has continued to apply collections of the proceeds of liquidation of its collateral to the prepetition loan, and treated requests for the use of cash collateral as increases to the loan balance. (Tr. 11/15/94, Docket No. 673, at p. 15).

30. NationsBank has added attorney's fees and interest to the amount of its debt from the petition date through the date of the hearing.

31. NationsBank asserts that its superpriority claim should be larger than that which it has sought, but limits its request to the remaining assets of the estate in which it does not believe it already has a security interest.

32. There are four elements to the establishment of a superpriority claim under Section 507(b) based on the failure of adequate protection for the use of cash collateral.

33. First, use of the cash collateral must be authorized. A Chapter 11 debtor in possession is required to segregate cash collateral, and is not permitted to use cash collateral in the ordinary course of business unless each entity that has an interest in the cash collateral consents. 11 U.S.C. § 363(c).

34. Absent consent, a debtor in possession may be permitted to use cash collateral after notice and a hearing. 11 U.S.C. § 363(c)(2)(B).

35. Second, there must be adequate protection given for the use of the cash collateral. The protection afforded a creditor whose cash collateral is permitted by the court to be used by a debtor in possession is whatever condition is deemed necessary to provide adequate protection of the creditor's interest. 11 U.S.C. § 363(e).

36. Third, there must be a failure of the value of the adequate protection deemed necessary. If there is an administrative expense claim in favor of a creditor as a result of failure of the value of the adequate protection conditions the court deems appropriate in allowing the debtor in possession to use the cash collateral, that claim is entitled to superpriority pursuant to Section 507(b). *In re Carpet Center Leasing Co.,* 991 F.2d 682 (11th Cir.1993) *mod.,* 4 F.3d 940 (11th Cir. 1993); *In re Mutschler,* 45 B.R. 494 (Bankr. D.N.D.1984).

37. Implicit in the statutory scheme is that cash collateral is being used in the ordinary course of business. Notice and a hearing are required where the debtor in possession seeks to use estate property other than in the ordinary course of business. 11 U.S.C. § 363(b)(1).

38. In a reorganization case, it may be in the ordinary course of business for a debtor to make payments on its secured debt. In a liquidation, it is not in the ordinary course of business of the debtor to distribute funds to such a creditor on account

of its prepetition debt, particularly when there may be insufficient funds to pay all administrative claims in the case. The Debtor announced that it would be liquidating rather than reorganizing fifteen days after the filing of the petition (See Finding of Fact No. 3, above).

39. NationsBank's collection and application of the proceeds of liquidation of the collateral to prepetition debt was not authorized by this court. The alleged superpriority claim for monies NationsBank asserts are still unpaid, arose by operation of NationsBank's unauthorized application of these proceeds. The court concludes that there was no showing of failure of adequate protection on the facts of this case.

40. Fourth, in order for there to be a superpriority claim resulting from the failure of adequate protection, it must first be allowed as an administrative expense claim. *In re Carpet Center Leasing Co.*, 991 F.2d 682 (11th Cir.1993).

41. Section 503(b) provides for the allowance of administrative expense claims for the actual, necessary costs and expenses of preserving the estate.

42. In this case, it is clear that NationsBank intended no benefit to the bankruptcy estate. NationsBank could have elected to foreclose, and did obtain relief from the automatic stay to foreclose on the remaining collateral. It elected not to foreclose for eleven months following Debtor's announcement that it would be liquidating. The court concludes that NationsBank made a business decision to attempt to receive a higher price for the sale of its collateral by permitting the Debtor to liquidate rather than by foreclosing and liquidating the collateral itself. At the same time, NationsBank has continued to take for itself all the cash generated by Debtor's operations and all proceeds from the sale of the collateral.

43. NationsBank never sought court authority to allow NationsBank to apply the postpetition collections received by Debtor to NationsBank's prepetition debt.

44. NationsBank's request for superpriority status under 11 U.S.C. § 507(b) is de-

nied except as to the $794,875.00 allowed pursuant to the Wage Order.

45. The court concludes that the Joint Motion of NationsBank of Texas, N.A., and the Chapter 11 Trustee for (i) Reconsideration of Order Denying First Claims Allowance Motion Without Prejudice and (ii) Approval of Revised Sharing Agreement as Compromise and Settlement Agreement under Rule 9019 should be denied.

## E. *Conversion*

46. On motion of a creditor, the court may convert a Chapter 11 case to a Chapter 7 case for cause, including continuing diminution of the estate and the absence of a reasonable likelihood of rehabilitation, inability to effectuate a plan, and unreasonable delay by the debtor that is prejudicial to creditors.

47. The Committee, Trustee, NationsBank, Debtor, and TABC and TEC have all announced that they believe no rehabilitation or reorganization of this Debtor is possible.

48. The testimony indicates that virtually all property of the estate has been liquidated, and that what remains to be done to conclude this case is to complete the liquidation and to determine the proper distribution of the proceeds according to the priority scheme of the Bankruptcy Code. The Debtor is no longer a "going concern", nor is it involved in significant ongoing liquidation, and no benefit appears to be served by retaining this case in Chapter 11. The court concludes that sufficient cause exists warranting conversion of this case to Chapter 7.

Based on the foregoing, a separate judgment will be entered denying the Compromise Motion and granting the Motion to Convert.