**In re GENERAL HOMES
CORPORATION,
Debtor.**

**Bankruptcy No. 90–04810–H3–11.**

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

April 26, 1995.

John F. Higgins, IV, Verner Liipfert Bernhard McPherson & Hand L.L.P., Houston, TX, for debtors.

Robert S. Blanc, Sewell & Riggs, Houston, TX, for Jackson Nat. Life Ins. Co.

Susan J. Brandt, Nathan Wood & Sommers, Houston, TX, for Anthony Ben Walsh.

William Schultz, Jackson & Walker, Houston, TX, for Bank Group.

Marilee A. Madan, Porter & Hedges, Houston, TX, for Dean Witter High Yield.

Robert D. Albergotti, Haynes & Boone, Dallas, TX, for James P. Moon.

*MEMORANDUM OPINION*

LETITIA Z. CLARK, Bankruptcy Judge.

The court has considered the Joint Motion to Compromise Controversy Pursuant to Bankruptcy Rule 9019 and Local Bankruptcy Rule 7041(a) filed by General Homes Corporation ("GHC"), FGMC, Inc. ("FGMC"), American Savings of Florida, F.S.B., successor to American Savings and Loan Association of Florida ("American"), Citicorp Real Estate, Inc. ("CREI"), Bank One, Texas, N.A. ("Bank One, Texas"), Mellon Mortgage Company, f/k/a Mellon Financial Services Corporation # 9 ("Mellon"), Chemical Bank ("Chemical"), First Union National Bank of Florida, successor in interest to the FDIC as receiver of Southeast Bank, N.A. ("First Union"), Bank One, Arizona, N.A. f/k/a Valley National Bank of Arizona ("Bank One, Arizona"), NationsBank, N.A., successor to NCNB National Bank of North Carolina ("NationsBank"), PNC Bank, N.A., f/k/a Pittsburgh National Bank ("PNC"), Hibernia National Bank ("Hibernia"), Lomas Mortgage USA, Inc. ("Lomas"), State National Bank ("State"), IGBF, Inc. ("IGBF"), Lehman Brothers, Inc., and its predecessors ("Lehman"), Arthur Andersen & Co., L.L.P. ("Andersen"), Jeffrey P. Payson ("Payson") James W. Olafson ("Olafson"), Simpson, Dowd, & Moon, P.C., ("SDM"), James P. Moon ("Moon"), Robert K. Dowd ("Dowd"), Searcy L. Simpson, Jr. ("Simpson"), Dean Witter High Yield Securities Inc. ("DW High Yield"), Jackson National Life Insurance Company ("Jackson National"), Bankers Trust Company ("BTC"), S.N. Phelps and Co. ("Phelps"), Seymour Licht ("Licht"), Anthony B. Walsh ("Walsh"), and Karl R. Ziebarth ("Ziebarth") (Docket No. 2863), together with the pleadings, evidence, and arguments of counsel. The following are the Findings of Fact and Conclusions of Law of the court. A separate Judgment will be entered denying without prejudice approval of the motion. To the extent any of the Findings of Fact may be considered Conclusions of Law, they are adopted as such. To the extent any of the Conclusions of Law may be considered Findings of Fact, they are adopted as such.

*Findings of Fact*

1. The General Homes Corporation bankruptcy case was commenced on July 10, 1990, by the filing of an Involuntary Petition by creditors S.N. Phelps & Co., Inc., Eleanora M. Crosby, and Howard E. Leppla against GHC. After GHC elected not to contest the petition, this court entered an Order for Relief on August 14, 1990. GHC has continued as debtor-in-possession during the pendency of this case.

2. The United States Trustee appointed the Official Committee of Unsecured Creditors of GHC ("Committee") on September 4, 1990 and, at the request of Walsh, reconstituted its membership on October 22, 1990. The members of the Committee were Ziebarth, Phelps, DW High Yield, Walsh, Licht, Jackson National, and Bankers Trust.

3. The court confirmed the Debtor's Third Amended Plan of Reorganization, as Modified, on October 30, 1991, over the objections of the Committee.

4. On June 19, 1991, the day before hearing was to begin on the contested plan for which Debtor was seeking confirmation, the Committee filed a "Complaint for Equitable Subordination, Recharacterization of Debt, Recovery of Fraudulent Conveyances and Preferences, Damages, Fraud, Negligent Misrepresentations, and Other Legal, Declaratory and Equitable Relief". The complaint was signed by Moon, and was docketed as Adv. No. 91–4367 (the "First Adversary").

5. The complaint sought to subordinate the secured claims of American, CREI, Bank One, Texas, Mellon, Chemical, First Union, Bank One, Arizona, NationsBank, PNC, Hibernia, Lomas, State, and IGBF (the "Bank Group") to the claims of unsecured creditors, the largest in number and amount of which were those arising from two series of GHC's subordinated debentures.

6. On July 12, 1991, this Court issued a "Show Cause Order" to the Committee, its individual members, and its counsel which consisted of the Milgrim Tomajon & Lee law firm as general counsel to the Committee and Simpson, Dowd & Moon ("SDM") as proposed special litigation counsel for the Committee (not then or subsequently ap-

proved pursuant to 11 U.S.C. § 327). The show cause hearing was ordered "to determine why the Committee, its individual members and its counsel should not be held in contempt for violation of the automatic stay, and to determine why the Committee, its members and its counsel should not be sanctioned pursuant to F.R.C.P., R. 11 and B.R. 9011." (Adv. No. 91–4367, Docket No. 5).

7. On October 3, 1994, the Court entered its Memorandum Opinion (Adv. No. 91–4367, Docket No. 193) and Interlocutory Judgment (Adv. No. 91–4367, Docket No. 194) in the First Adversary. Pursuant to the Interlocutory Judgment, the Committee members and one of its attorneys were held liable for sanctions in an amount which was to be determined at a later date.

8. The instant motion to compromise was filed after a two day mediation, and prior to the hearing at which the amount of sanctions was to be determined.

9. The motion to compromise seeks to resolve several controversies pending among the various movants, including:

a. The amount of sanctions arising from the First Adversary.

b. The Committee's appeal of this court's orders (Docket Nos. 1608 and 1609) entered October 31, 1991 confirming the Debtors' plans. (Civil Action Nos. H–91–3512, H–91–3516).

c. The Committee's appeal of this court's order (Docket No. 1219) extending the exclusive period to solicit acceptance of Debtors' plans. (Civil Action No. H–91–2364).

d. Two additional adversary proceedings, in which the Committee and one of its members sought relief substantially identical to that sought in the First Adversary. (Adv. Nos. 91–4516, 91–4518).

10. The compromise for which approval is sought calls for the "SDM Group", which is comprised of SDM and Simpson, Dowd, and Moon individually, and the "Creditors' Committee Group", which is comprised of the Committee members, to pay $175,000 to the named beneficiaries, which include the Debtors, the Bank Group, Lehman, Andersen, Payson, and Olafson.

11. The compromise proposes dismissal of the three adversary proceedings and the three appeals. The compromise also calls for mutual releases between the SDM Group, Creditors' Committee Group and beneficiaries, between the SDM Group and Creditors' Committee Group, and among the Committee members.

12. The compromise calls for, and is conditioned upon, this court's vacatur of its Memorandum Opinion and Interlocutory Judgment of October 3, 1994.

13. The movants have requested that the court take the extraordinary steps of removing the original Memorandum Opinion and Interlocutory Judgment from the file and the docket sheet maintained by the court. (Docket No. 2863, at p. 8).

14. The settlement agreement provides that its terms are not severable. (Exhibit No. 1, at p. 7).

15. The settlement agreement calls for Robert D. Albergotti to serve as escrow agent. Albergotti testified that he participated in the two day mediation as attorney for Moon, and assumed the role of scrivener in drafting the settlement. Albergotti testified regarding the conditions under which the settlement embodied in the Settlement Agreement would be consummated. Among those provisions is the vacatur of the Memorandum Opinion and Interlocutory Judgment.

16. Albergotti testified that he believes that the Memorandum Opinion and Interlocutory Judgment would be appealed in the absence of approval of the settlement. Albergotti believes that those appeals would involve unsettled questions of law, and would be expensive to all parties involved.

17. At the hearing on the Joint Motion to Compromise, Albergotti testified that in his capacity as Moon's attorney, he believes the proposed settlement is in his client's best interest, because it would enable his client to practice in other jurisdictions without first explaining the events which led to the Memorandum Opinion and Interlocutory Judgment.

18. GHC takes the position that it is willing to accept the condition of vacatur as part

of the settlement. The proposed settlement would allow Debtor to avoid the expense of additional long-term litigation.

19. Albergotti, DW High Yield, and Jackson National all raise the issue that the Memorandum Opinion may stand as a precedent which may chill the willingness of individual and institutional creditors to sit on committees, and to rely upon the advice of committee counsel.

*Conclusions of Law*

1. Congress has directed that the judicial power with respect to bankruptcy cases be vested in the district courts. 28 U.S.C. § 1334. Congress has also provided for the creation of bankruptcy courts, 28 U.S.C. § 151, and allowed referral to the bankruptcy courts by the district court of any or all cases under Title 11 and any or all proceedings arising under Title 11 or arising in or related to a case under Title 11. 28 U.S.C. § 157.

2. The Southern District of Texas has entered a standing order directing reference of all such matters to the Bankruptcy Courts for the Southern District of Texas.

■ 3. In determining whether to approve a compromise of controversy, bankruptcy courts and courts reviewing the decisions of the bankruptcy courts have often cited for consideration the factors elaborated by the Supreme Court in *Protective Committee v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1967). Those factors include the probable success of the litigation on the merits, any potential difficulty in collection of a judgment, the complexity and expense of the litigation, and the interests of creditors. *See, e.g., Matter of Texas Extrusion Corp.*, 844 F.2d 1142 (5th Cir. 1988); *Matter of AWECO, Inc.*, 725 F.2d 293 (5th Cir.1984); *In re Kaiser Steel Corp.*, 105 B.R. 971 (D.Colo.1989). The court will address these factors in reverse order.

■ 4. The parties to the settlement agreement believe they are all better served if the settlement is approved, primarily due to the expense of continued litigation. The court has previously taken judicial notice of the facts that the contested hearing on confirmation of the plan consumed fifteen days of court time, and that the hearing on the order to show cause consumed ten days of court time. The parties have stated that they anticipate vigorous litigation over the amount of sanctions to be assessed in the absence of approval of the settlement, followed by lengthy appeals of each of the orders described in the Findings of Fact at paragraph 9, *supra.*

5. In addition, several of the parties believe that approval of the settlement allows them to avoid personal and professional embarrassment.

6. There is no evidence which suggests that the collectibility of any judgment which has been or may be entered is a factor in determination of the propriety of approving this settlement.

7. The issues raised in the various appeals and in the Memorandum Opinion and Interlocutory Judgment which arose from the Show Cause Order are complex.

8. There are two additional factors which must be considered in the public interest, along with the factors analyzed above. The first of these factors is the development of the law. The second, related, factor is the public interest in maintaining complete records in court proceedings.

9. The complex issues which resulted in the Memorandum Opinion and Interlocutory Judgment of October 3, 1994 reach to the very essence of the balance of fair play between debtors and creditors in Chapter 11.

10. Bankruptcy reorganization is an area of law which is unique among the disputes committed by Congress to the federal courts for resolution. It is unique because Chapter 11 contemplates that rather than reaching a single speedy judgment, the parties will participate in an ongoing process of negotiation, in an attempt to reach a consensual plan of reorganization, under which the debtor will continue to operate or liquidate to provide for the best interests of the creditors. *See,* H.R.Rep. No. 595, 95th Cong. 1st Sess. 220, 221 (1977).

11. There are significant gaps in the statutory drafting and interpretation of the

Bankruptcy Code regarding the proper role and scope of the actions of creditors' committees. In particular, Congress and the courts of appellate jurisdiction have thus far had little occasion to provide guidance as to how committees conduct themselves. This lack of guidance is especially important in large cases, in light of the committees' standing under Section 1109 of the Bankruptcy Code, to appear and be heard as parties in interest separate and independent from their members and the creditors they represent. It is not clear, for example, how a committee is to govern itself, how it may take a vote, when and how it circulates necessary copies of documents under discussion to its members, and to what extent it may rely upon the advice of counsel in choosing to initiate action on behalf of the creditors it represents.

12. This court's Memorandum Opinion and Interlocutory Judgment of October 3, 1994 are an early interpretation in a developing area of the law for which there has been little statutory and case law guidance.

13. The court has previously found, in its Memorandum Opinion, that the Committee in this case ignored the advice of its general counsel that it should not file the First Adversary without leave of court in light of the Fifth Circuit's opinion in *Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233 (5th Cir.1988). (Docket No. 193, Adv. No. 91–4367, at p. 11). Yet the Committee filed the First Adversary on the eve of the hearing on confirmation of the plan, as a trial tactic to oppose and delay the contested confirmation hearing and prevent confirmation of the plan. (*See* Findings of Fact at Docket No. 193, Adv. No. 91–4367, at p. 7).

14. The federal judiciary was designed by the framers of the Constitution to stand independent of the executive and legislature—to maintain the checks and balances of the constitutional structure, and also to guarantee that the process of adjudication itself remained impartial. *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).

15. Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of the Supreme Court as ultimate interpreter of the Constitution. *Northern Pipeline,* 458 U.S. at 62, 102 S.Ct. at 2866–67, *citing Baker v. Carr,* 369 U.S. 186, 211, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962); *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

16. Gaps in statutory drafting may lead to opinions on difficult questions that eventually, with or without conflicts among the circuits, lead to the Supreme Court. After the Supreme Court delivers its opinion, Congress may examine its own drafting, in light of the interpretation of the Supreme Court, to see if the drafting now reflects the intent of Congress. Congress amends the language of the statute if it deems amendment necessary. In a bankruptcy context, *see, e.g.,* 130 Cong.Rec. H7492, reprinted in 1984 U.S.C.C.A.N. 576 (statement of Rep. Kastenmeier) (1984 bankruptcy amendments passed in response to Supreme Court opinion in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50 (1982)); *see also,* H.R.Rep. No. 855, 103rd Cong., 2d Sess. Sec. 113 (1994) (Sovereign immunity changes in 1994 amendments following Supreme Court opinions in *Hoffman v. Connecticut Department of Income Maintenance,* 492 U.S. 96, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989) and *United States v. Nordic Village, Inc.,* 112 S.Ct. 1011 (1992)). This is a respectable and useful process, albeit expensive to the court system and litigants.

17. Committees play an active and vital role in the administration of a Chapter 11 case and the development of a viable plan of reorganization. It is necessary to the reorganization process that a committee exercise its role carefully and judiciously, and not bring to the attempted reorganization, tactics invoked for the improper purposes of harassment or delay. In the instant case, a number of the individual Creditors' Committee members were sophisticated and wealthy individuals who had participated on previous large bankruptcy creditors' committees, and brought the benefit of their experience to

what should have been a responsible use of the power of the Committee.

18. Were this court to vacate its Memorandum Opinion, the questions there addressed would remain unaddressed in the case law. The deletion of what one person might call a "chilling effect" opinion may lead to what another might call "revisionist history". The members of the Committee in the instant case, and creditors in future large and complex reorganization cases could represent to other courts, as they have done here, that there is no precedent for the proposition that committee members and their counsel may be liable for the actions they take in attempting to gain leverage in the reorganization process.

19. The court notes that individual creditors may obtain counsel of their choice, at their own expense, in order to increase their sense of security as to the advice the Committee is receiving from proposed "special litigation counsel". Such a course might be particularly advisable where, as here, the proposed special litigation counsel was giving advice contrary to that of the Committee's general counsel.

20. The federal courts have long recognized the strong common law presumption in favor of public access to court proceedings and records. *In re Analytical Systems, Inc.,* 83 B.R. 833 (Bankr.N.D.Ga.1987); *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597, 98 S.Ct. 1306, 1311–12, 55 L.Ed.2d 570 (1978); *Wilson v. American Motors Corp.,* 759 F.2d 1568, 1570 (11th Cir.1985).

21. The presumption is codified in Section 107(a) of the Bankruptcy Code, which provides that a paper filed in a bankruptcy case and the dockets of a bankruptcy court are public records and are open to examination by an entity at reasonable times without charge.

22. The court has authority to seal court records, in order to protect trade secrets or confidential research, development, or confidential information, or to protect a person with regard to a scandalous or defamatory matter. 11 U.S.C. § 107(b). For a bankruptcy court to seal court records pursu-

ant to its discretionary authority to limit public access to papers, the court must specifically find that the interest of secrecy outweighs the presumption in favor of access. *In re Continental Airlines,* 150 B.R. 334 (D.Del.1993). That is not the case here.

23. Destruction of the file copies of the Memorandum Opinion and Interlocutory Judgment is beyond the scope of the court's authority pursuant to Section 107, and is contrary to public policy.

24. The court balances the potential chilling effect of its prior Memorandum Opinion with the public benefits of further delineating the law and maintaining public records, and concludes that the vacatur and destruction of its Memorandum Opinion and Interlocutory Judgment as requested by the parties to the settlement is not justified.

25. Because the compromise is not severable from the vacatur and destruction of the court's Memorandum Opinion and Interlocutory Judgment on the face of the agreement, the court is constrained to deny approval of the compromise.

Based on the foregoing, a separate Judgment will be entered denying without prejudice approval of the Joint Motion to Compromise.