478 F.3d 452
 In re IRIDIUM OPERATING LLC, Iridium Capital Corp., Iridium IP LLC, Iridium LLC, Iridium Roaming LLC, Iridium (POTOMAC) LLC, and Iridium Promotions, Inc., Debtors.
Motorola, INC., Appellant,
v.
OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND JPMORGAN CHASE BANK, N.A., Appellees.
 Docket No. 05-2236-BK.
 United States Court of Appeals, Second Circuit.
 Argued: May 11, 2006.
 Decided: March 5, 2007.
 
 Garrett B. Johnson, Kirkland & Ellis LLP, Chicago, IL (James H.M. Sprayregen, Kirkland & Ellis LLP, Chicago, IL; Frank Holozubiec and Gregory T. Heyman, Kirkland & Ellis LLP, New York, NY), for Appellant.
 Martin J. Bienenstock, Weil, Gotshal & Manges LLP, New York, N.Y. (Greg A. Danilow and Diane Harvey, Weil, Gotshal & Manges LLP, New York, NY), for Appellee Official Committee of Unsecured Creditors.
 Andrew D. Gottfried, Morgan, Lewis & Bockius LLP, New York, N.Y. (Richard S. Toder, William C. Heuer and Robert E. Cortes, Morgan, Lewis & Bockius LLP, New York, NY), for Appellee JPMorgan Chase Bank, N.A.
 Before: SOTOMAYOR, WESLEY, AND HALL, Circuit Judges.
 WESLEY, Circuit Judge:
 
 
 1
 There is little doubt that settlements of disputed claims facilitate the efficient functioning of the judicial system. In Chapter 11 bankruptcies, settlements also help clear a path for the efficient administration of the bankrupt estate, including any eventual plan of reorganization. Before pre-plan settlements can take effect, however, they must be approved by the bankruptcy court pursuant to Bankruptcy Rule 9019.
 
 
 2
 This case requires us to determine whether a long-standing creditor protection—the Bankruptcy Code's priority scheme for reorganization plan distributions—applies to bankruptcy court approval of a settlement under Rule 9019. We hold that in the Chapter 11 context, whether a pre-plan settlement's distribution plan complies with the Bankruptcy Code's priority scheme will be the most important factor for a bankruptcy court to consider in approving a settlement under Bankruptcy Rule 9019. In most cases, it will be dispositive.
 
 
 3
 Iridium Operating LLC ("Iridium")[1] is currently in Chapter 11 proceedings. A consortium of lenders represented by JPMorgan Chase Bank, N.A. (the "Lenders"),[2] asserted liens over much of what is left of Iridium. The Official Committee of Unsecured Creditors (the "Committee") vigorously contested those liens; in particular, the Committee objected to the Lenders' claim to Iridium's remaining cash held in accounts at Chase. The Committee also sought to pursue claims against Motorola, Inc. ("Motorola"), Iridium's former parent company, but lacked money to fund the litigation. The Committee and the Lenders ultimately decided to settle their dispute and sought court approval of their settlement (the "Settlement") under Bankruptcy Rule 9019. The Settlement concedes the liens and distributes the Estate's cash to the Lenders and to a litigation vehicle set up to sue Motorola. Motorola, also an administrative—and, therefore, priority—creditor, objects to the Settlement on the grounds that it takes a portion of estate property and distributes it to lower priority creditors (the litigation vehicle and the Committee) before any payments are made to Motorola.
 
 Background
 
 4
 Motorola envisioned that the Iridium system would be the first network to provide voice and data communication anywhere on the globe using a complex scheme that linked handheld wireless devices to a network of low orbit satellites and ground stations. From 1987 until 1993, Motorola oversaw the system's development, with the project first taking form in 1991 as a subsidiary of Motorola. See In re Iridium Operating LLC, 285 B.R. 822, 824-25 (S.D.N.Y.2002). In 1993, Motorola spun off Iridium after entering into a "series of contracts with Iridium concerning the design, construction and launch of the Iridium System."[3] Id. at 825. By 1997, all of the assets of the Iridium System had been shifted into Iridium Operating LLC, a company wholly owned by Iridium LLC, Chase Manhattan Bank v. Motorola, Inc., 136 F.Supp.2d 265, 266 (S.D.N.Y.2001), although Iridium continued to pay Motorola for maintaining and operating the Iridium System. Iridium's commercial services were launched on November 1, 1998.
 
 
 Iridium's Bankruptcy
 
 
 5
 Skeptics' assertions that there would be little demand for the service were quickly confirmed. As of March 31, 1999, Iridium had over $4 billion in debt and only 10,294 subscribers, far fewer than the one million subscribers observers predicted it would need to be viable. See In re Iridium, No. 01 Civ. 5429(GBD), 2005 WL 756900, *1 (S.D.N.Y. Apr.4, 2005); Chase Manhattan Bank v. Motorola, Inc., 184 F.Supp.2d 384, 386 (S.D.N.Y.2002). On August 13, 1999, Iridium Operating and Iridium LLC filed voluntary Chapter 11 bankruptcy petitions in United States Bankruptcy Court for the District of Delaware. Those petitions were later transferred to bankruptcy court in the Southern District of New York, where involuntary Chapter 11 bankruptcy petitions had been filed on the same day. Iridium continues to operate its business and manage its properties as debtor-in-possession.
 
 
 Relevant Credit Facilities and the Lenders' Purported Liens
 
 
 6
 In the months before Iridium announced its collapse, it borrowed $1.55 billion from the Lenders. Chase, 184 F.Supp.2d at 386. Although there were a number of agreements, or credit facilities, one executed on December 23, 1998 is most relevant here. That "Senior Secured Credit Agreement" provided for an $800 million loan to Iridium. Id. This credit agreement served as the basis for the Lenders assertion that they obtained "valid, enforceable, properly perfected liens" on, and security interests in, all of Iridium's property, including: roughly $156 million in cash deposits; the satellite operations center and a real property lease in northern Virginia; $243 million in reserve capital calls; the satellites; and various causes of action, including claims against Motorola.
 
 
 7
 Post-petition, Iridium still needed money to run its daily operations. The Lenders and Iridium entered into a series of six cash collateral stipulations that allowed Iridium to draw out cash to pay for basic operating expenses while the Lenders maintained their possessory liens on the remaining balances. Each of the stipulations declared that the liens were valid, enforceable, and perfected.[4] The stipulations further provided that any party in interest could contest the stipulations, if they filed an adversary proceeding within a specified period.[5] Both Iridium and Motorola signed the Third Cash Collateral Stipulation, dated December 15, 1999. Motorola did not challenge the Third Cash Collateral Stipulation out of its desire "to avoid liability relating to de-orbiting Iridium's 66 satellites." At the hearing to approve the Settlement, the Committee candidly acknowledged that it was unclear whether Motorola could challenge the Lenders' purported liens under the terms of the stipulation had it attempted to file an objection during the prescribed time period.
 
 
 The Committee's Challenge to the Lenders' Purported Liens
 
 
 8
 Unlike Motorola, the Committee did challenge the validity of the Lenders' purported liens. The Committee retained special counsel to investigate the validity of the liens and, following what the Committee described as an extensive investigation, it "determined that the Estate[ ] possessed several potentially meritorious causes of action against [the Lenders.]" The Committee specifically objected to any attempts by the Lenders to assert liens over Iridium's remaining cash, held by Chase. The Committee argued that upwards of "90% of the cash and securities on hand at Iridium as of the Petition Date . . ." was transferred to Iridium within 90 days of the Petition Date, August 13, 1999, and therefore any security interest or lien asserted by the Lenders in that cash was avoidable under the Bankruptcy Code. See 11 U.S.C. § 547(b). The Committee noted that it stood to recover at least $260 million if it was successful on just one of its challenges. The Committee also claimed that several interest payments made to the Lenders just before the filing of the petition for bankruptcy were avoidable. Additionally, the Committee contended that any purported liens resulting from the Cash Collateral Stipulations were similarly avoidable.
 
 
 9
 The bankruptcy court authorized the Committee, on June 7, 2000, to commence adversarial proceedings on behalf of the Estate against the Lenders as to the debt "and any lien, pledge or security interest of Chase and/or the Lenders."
 
 
 The Committee Pursues Motorola
 
 
 10
 The Committee was busy on another front as well. Just before the Committee sought authorization to commence an action against the Lenders, it moved for permission to press claims against Motorola. The Committee argued that Iridium had causes of action against Motorola for breach of contract, breach of fiduciary duty, and avoidance of fraudulent conveyances. In the suit against Motorola, the Estate, via the Committee, seeks billions of dollars in damages. The Committee contends that the causes of action grew "out of the incredibly unique relationship between Motorola and Iridium pursuant to which Motorola dominated and controlled all critical aspects of Iridium's operations, finances and corporate governance." According to the Committee, while Iridium was still a subsidiary "Motorola caused Iridium to execute a series of one-sided, overreaching contracts extremely lucrative to Motorola and grossly unfair to Iridium from a financial, legal and risk allocation perspective." The Committee further alleges that even after the spin off, Motorola continued to dominate Iridium through a parasitic relationship that insulated Motorola from any risk associated with Iridium. The bankruptcy court granted the Committee's motion on March 15, 2000.
 
 
 Settling One Action to Pursue The Other
 
 
 11
 The Estate was thus poised to pursue complicated and expensive litigation on two fronts. But the Estate had limited resources and would be gutted if the Lenders successfully asserted their liens. The Committee decided to seek a settlement with the Lenders and to focus its litigation efforts on Motorola.[6] The Committee entered into settlement discussions with the Lenders and, after approximately six months of negotiation, completed a settlement agreement on January 19, 2001. This Settlement, among other things, resolved the question of the purported liens. The Committee and the Lenders sought approval of the Settlement on January 26, 2001.
 
 
 The Settlement's Terms
 
 
 12
 The Settlement is lengthy and complex, but only a few of its provisions are in play here. First, the Settlement determines that the Lenders' liens are senior, perfected, and unavoidable and not subject to offsets, defenses, claims, or counterclaims by the Estate. The liens do not enjoy those concessions, however, until court approval of the Settlement.
 
 
 13
 Second, the Settlement divides up the Estate's remaining cash into three separate cash funds. Cash Fund Number One splits $130 million two ways: the Lenders get $92.5 million and $37.5 million will be distributed by the Estate directly to a newly-created entity, the Iridium Litigation LLC (the "ILLLC"). Cash Fund Number Two gets $5 million for professional expenses, including attorneys' fees. This fund is also split two ways: one-third goes to one of the law firms involved in negotiating the Settlement and two-thirds goes to the ILLLC for payment of professional expenses. Any interest accumulated in Cash Fund Numbers One and Two goes to the Lenders (approximately 71 percent) and to the ILLLC (approximately 29 percent). Cash Fund Number Three includes income from accounts receivable. Fifty-five percent of Cash Fund Number Three goes to the ILLLC, and the remainder goes to the Lenders on the effective date of the Settlement.
 
 
 14
 The ILLLC was created to serve as a funding vehicle for all Motorola-related litigation.[7] See In re Iridium, 2005 WL 756900 at *2. A litigation trust, whose beneficiaries are the unsecured creditors, owns 99.9 percent of the ILLLC. Further, the ILLLC is controlled by Committee members and represented by Committee counsel. Should the Committee and the Estate prevail against Motorola, the Settlement provides that the proceeds, after the payment of any of the ILLLC's professional fees, will be split among the Lenders, administrative creditors, and the Estate. The Lenders would take 37.5 percent of any recovery. The other 62.5 percent of the recovery would go to the Estate, to be distributed according to a future, as-yet-unconfirmed reorganization plan, with administrative creditors—such as Motorola—taking first.[8] Id. Thus, a large portion of any monies recovered from Motorola as a result of the Motorola Estate Action will flow to the Estate and be distributed according to the Bankruptcy Code's priority scheme and creditors behind the Lenders will receive payment of their claims even if the Lenders' claims are not fully satisfied by the Motorola-related litigation. Any of the initial $37.5 million remaining in the trust at the end of the litigation will be paid by the ILLLC directly to the unsecured creditors. The Settlement further dictates that its signatories will only support a reorganization plan consistent with the terms of the Settlement.
 
 
 15
 From the Committee's perspective, the Settlement has a number of benefits. The Settlement (1) frees up cash from the Lenders' purported liens to fund the Motorola litigation; (2) allows creditors behind the Lenders to receive payment of their claims before the Lenders' claims are fully satisfied; (3) eliminates the Lenders' liens on any recovery from the Motorola cause of action; (4) coordinates litigation against Motorola; (5) allows the Estate to pursue causes of action that would normally belong to the Lenders, such as disputes over whether any of Motorola's administrative claims must be subordinated to the Lenders' claims; (6) frees other assets, such as non-Motorola causes of action (which it then ensures are funded), from Lenders' purported liens; and (7) results in an immediate payment of almost $7 million dollars to the Estate for resolution of other issues. In addition, the Lenders waive any rights they might have as unsecured creditors to receive any of the proceeds of the Motorola Estate Action. According to the Committee, the Settlement will help maximize the potential recovery against Motorola. The Committee also points out that if it lost its challenge of the purported liens, unsecured creditors would receive nothing unless and until the Lenders were paid at least the $800 million covered by the December 23, 1998 credit facility. The Committee was clearly concerned with the risk of litigating with the Lenders; the litigation process would be long and expensive and involve novel legal issues,[9] and a loss would leave the Estate all but penniless.
 
 
 16
 On March 6, 2001, the bankruptcy court held a hearing and approved the Settlement over Motorola's objections. Motorola appealed to the district court,[10] (Daniels, J.) which in turn affirmed the bankruptcy court. In re Iridium, 2005 WL 756900. Motorola appealed to this Court.
 
 Discussion
 A. Whose Money Was It: In re SPM
 
 17
 The Lenders (and the Committee) argue that the roughly $130 million in Cash Fund Number One is actually the Lenders' property to do with as they see fit, including distributing $37.5 million to the ILLLC as seed money to pursue Motorola in hopes of realizing something more than a one-sixth return on its $800 million loan. Noting that Motorola does not contest the validity of the liens, the Lenders and the Committee point to the reasoning of a First Circuit case, Official, Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.), 984 F.2d 1305, 1307, 1312 (1st Cir.1993), for support.
 
 
 18
 SPM stands for the proposition that in a Chapter 7 liquidation proceeding, an under-secured lender with a conclusively determined and uncontested "perfected, first security interest" in all of a debtor's assets may, through a settlement, "share" or "gift" some of those proceeds to a junior, unsecured creditor, even though a priority creditor will go unpaid. Id. at 1307, 1312. The Lenders and the Committee ask us to expand SPM to Chapter 11 settlements and then apply it here for the first time.
 
 
 19
 The Lenders and the Committee assert that SPM stands for the proposition that "if the cash on hand at [Chase] was perfected collateral of the Secured Lenders for valid debt, the Secured Lenders had the right to dispose of such cash in any manner that they chose so long as the cash did not exceed the debt owed to the Secured Lenders." (emphasis added). In their view, the cash belongs to the Lenders, not the Estate, and the Lenders can dispose of that cash as they wish.
 
 
 20
 Here, the Settlement perfected and validated the Lenders' liens only upon the entry of an order approving the Settlement and only to the extent authorized by the Settlement.[11] Until the Settlement was approved, then, the Lenders' liens were contested and the money held by the Lenders was an asset of the Estate.[12] This case is quite different from SPM, where the creditor had an uncontested, "perfected, first security interest in all of SPM's assets except certain real estate." Id. at 1307.
 
 
 21
 Thus, we need not decide if SPM could ever apply to Chapter 11 settlements, because it is clear that the Lenders did not actually have a perfected interest in the cash on hand. Id. at 1312. While the approval of the Settlement eliminates the disputes regarding the Lenders' rights to some of the money, it also provides for the distribution of the balance for a number of purposes, most notably, the Motorola litigation. Bankruptcy Rule 9019 provides the appropriate scale on which to weigh the settlement.
 
 B. Bankruptcy Rule 9019[13]
 
 22
 Bankruptcy Rule 9019, unique in that it does not have a parallel section in the Code,[14] has a "clear purpose . . . to prevent the making of concealed agreements which are unknown to the creditors and unevaluated by the court." In re Masters, Inc., 141 B.R. 13, 16 (Bankr. E.D.N.Y.1992). Courts have developed standards to evaluate if a settlement is fair and equitable, and, to that end, courts in this Circuit have set forth factors for approval of settlements based on the original framework announced in TMT Trailer Ferry. Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968);[15] see also 10 Collier on Bankruptcy ¶ 9019.02 (15th ed. rev.) (citing TMT Trailer Ferry). Those interrelated factors are: (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the para mount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"; (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to which the settlement is the product of arm's length bargaining." In re WorldCom, Inc., 347 B.R. 123, 137 (Bankr. S.D.N.Y.2006); see also TMT Trailer Ferry, 390 U.S. at 424, 88 S.Ct. 1157; In re Drexel Burnham, 960 F.2d at 292.
 
 C. The "Fair and Equitable" Standard
 
 23
 Motorola does not contend that the Settlement fails under this multi-factor test. Rather, it argues that the Settlement should not have been approved because it provides for the transfer of money from the Estate to the ILLLC, and from the ILLLC to the unsecured creditors after the Motorola-related litigation. Motorola claims that a settlement can never be fair and equitable if junior creditors' claims are satisfied before those of more senior creditors.
 
 
 24
 The phrase "fair and equitable" derives from Section 1129(b)(2)(B)(ii) of the Bankruptcy Code, which describes the conditions under which a plan of reorganization may be approved notwithstanding the objections of an impaired class of creditors,[16] a situation known as a "cramdown." See Coltex Loop Cent. Three Partners v. BT/SAP Pool C Assocs. (In re Coltex Loop Cent. Three Partners, L.P.), 138 F.3d 39, 42 (2d Cir.1998); see also Kenneth N. Klee, All You Ever Wanted to Know About the Cram Down Rule Under the New Bankruptcy Code, 53 AM. BANKR. L.J. 133 (1979). This provision codifies the judge-made "absolute priority rule," which provided that any plan of reorganization in which "stockholders [a]re preferred before the creditor, [is] invalid." In re Armstrong World Indus., Inc., 320 B.R. 523, 533 (D.Del.), aff'd 432 F.3d 507 (3d Cir. 2005) (quoting N. Pac. Ry. v. Boyd, 228 U.S. 482, 504, 33 S.Ct. 554, 57 L.Ed. 931 (1913) (second alteration in original)).[17] In its current statutory form, the rule provides that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii).
 
 
 25
 Although the statute by its terms applies only to plans of reorganization, the Supreme Court has held that a settlement presented for approval as part of a plan of reorganization, because it constitutes part of the plan, may only be approved if it, too, is "fair and equitable" in the sense of conforming to the absolute priority rule. See TMT Trailer Ferry, 390 U.S. at 424, 88 S.Ct. 1157 ("The requirements . . . that plans of reorganization be both `fair and equitable,' apply to compromises just as to other aspects of reorganizations."). When a settlement is presented for court approval apart from a reorganization plan, however, the priority rule of 11 U.S.C. § 1129 is not necessarily implicated. Without the requirement that pre-plan settlements conform to the absolute priority rule, only the bankruptcy court's invocation of Rule 9019 factors would protect the interests of any nonsignatory intermediate or impaired creditors.[18]
 
 
 26
 In response to this concern, the Fifth Circuit held that the absolute priority rule should also apply to pre-plan settlements, concluding that "a bankruptcy court abuses its discretion in approving a [pre-plan] settlement with a junior creditor unless the court concludes that priority of payment will be respected as to objecting senior creditors." United States v. AWECO, Inc. (In re AWECO, Inc.), 725 F.2d 293, 298 (5th Cir.1984). The pre-plan settlement in AWECO sought to resolve litigation involving the debtor and a junior unsecured creditor. Id. The district court approved the settlement without considering proof from the senior secured creditors that the costs of the settlement could seriously deplete the estate and jeopardize the priority position of the senior creditors. The junior creditor argued that priority creditors' claims are often unresolved when settlements with individual creditors occur well in advance of approval of a reorganization plan. Thus it pressed that requiring conformity with the absolute priority rule would effectively preclude all settlements prior to a plan of reorganization. The Fifth Circuit rejected that argument and held that extension of the absolute priority rule to pre-plan settlements was necessary.
 
 
 27
 As soon as a debtor files a petition for relief, fair and equitable settlement of creditors' claims becomes a goal of the proceedings. The goal does not suddenly appear during the process of approving a plan of compromise. Moreover, if the standard had no application before confirmation of a reorganization plan, then bankruptcy courts would have the discretion to favor junior classes of creditors so long as the approval of the settlement came before the plan. Regardless of when the compromise is approved, looking only to the fairness of the settlement as between the debtor and the settling claimant contravenes a basic notion of fairness. An estate might be wholly depleted in settlement of junior claims—depriving senior creditors of full payment—and still be fair as between the debtor and the settling creditor.
 
 
 28
 Id. at 298. The Fifth Circuit accurately captures the potential problem a pre-plan settlement can present for the rule of priority, but, in our view, employs too rigid a test.
 
 
 29
 The Settlement here differs significantly from the facts in play in AWECO, and points out the shortcomings of the AWECO rule. The Settlement resolves claims of one group of senior creditors while at the same time compromising their preferred position by providing that they be paid only a portion of any monies received from the Motorola litigation. The Settlement also funds pursuit of the Estate's most significant asset—the Motorola claims. Lastly, many important facts are still in dispute. Motorola's claim as an administrative creditor is yet to be established, the costs of the litigation (and any balance remaining in the litigation fund at the close of the proceedings) are at best estimates, and the claims against Motorola are perhaps years from a sum certain judgment. It is difficult to employ the rule of priorities in the approval of a settlement in a case such as this when the nature and extent of the Estate and the claims against it are not yet fully resolved. In our view, a rigid per se rule cannot accommodate the dynamic status of some pre-plan bankruptcy settlements.
 
 
 30
 Rejection of a per se rule has an unfortunate side effect, however: a heightened risk that the parties to a settlement may engage in improper collusion. Thus, whether a particular settlement's distribution scheme complies with the Code's priority scheme must be the most important factor for the bankruptcy court to consider when determining whether a settlement is "fair and equitable" under Rule 9019. The court must be certain that parties to a settlement have not employed a settlement as a means to avoid the priority strictures of the Bankruptcy Code.
 
 
 31
 In the Chapter 11 context, whether a settlement's distribution plan complies with the Bankruptcy Code's priority scheme will often be the dispositive factor. However, where the remaining factors weigh heavily in favor of approving a settlement, the bankruptcy court, in its discretion, could endorse a settlement that does not comply in some minor respects with the priority rule if the parties to the settlement justify, and the reviewing court clearly articulates the reasons for approving, a settlement that deviates from the priority rule.
 
 
 32
 D. Application of the Rule 9019 Factors to this Settlement
 
 
 33
 The bankruptcy judge concluded that "[t]he terms of the Settlement Agreement are fair, reasonable and in the best interests of the Estate[]" and made a number of factual findings. With respect to the first two factors for Rule 9019 approval—(1) the balance between the litigation's likelihood of success and the settlement's future benefits and (2) the chances that the litigation will be complex and protracted—the court concluded that "[i]n assessing the risk of establishing liability and damages at trial, the Court finds that the Estate[] would face serious obstacles in establishing that the Lenders' liens are invalid." The Settlement's benefits, however, were substantial, "including potentially providing significant recovery to the Estate['s] creditors, including administrative creditors [e.g., Motorola], priority creditors and general unsecured creditors." In short, avoiding the liens involved an expensive and complex lawsuit which, even if ultimately successful, offered little reward. On the other hand, acknowledging the liens while obtaining funding to pursue the Estate's claims against Motorola held out promise for all creditors. We agree with the bankruptcy court that these first two factors support approval of the Settlement.
 
 
 34
 The third factor asks the bankruptcy court to evaluate whether the settlement is in the interests of the creditors. The fourth factor looks to what extent other parties in interest support the settlement. Here, both of these factors weigh in favor of approval of the Settlement. As the bankruptcy court noted, "[e]xcept for one alleged administrative creditor, Motorola, who is also the primary defendant with respect to the Motorola Estate Action, no other creditors have objected to the [S]ettlement." Given the Settlement's funding of Motorola's litigation opponent, Motorola's objection is understandable. Nevertheless, it is telling that no other creditor objects to the Settlement.
 
 
 35
 With respect to the fifth and seventh factors,[19] counsel on both sides, as well as the bankruptcy court judge, are competent and experienced. The bankruptcy court also found that the Settlement was "negotiated in good faith and at arms-length by the parties." No evidence points to the contrary.
 
 
 36
 What then of the Settlement's compliance with the Code's priority scheme? Motorola complains of the money transferred to the ILLLC, and focuses primarily on the distribution of what might remain of the $37.5 million in Cash Fund Number One at the conclusion of the ILLLC's litigation against Motorola. As previously noted, any residual money in the ILLLC will be distributed to unsecured creditors. As a result, that payment would violate the absolute priority rule if Motorola prevails in the litigation or its administrative claims exceed its liability in the litigation.
 
 
 37
 It is clear from the record why the Settlement distributes money from the Estate to the ILLLC. The alternative to settling with the Lenders—pursuing the challenge to the Lenders' liens—presented too much risk for the Estate, including the administrative creditors. If the Estate lost against the Lenders (after years of litigation and paying legal fees), the Estate would be devastated, all its cash and remaining assets liquidated, and the Lenders would still possess a lien over the Motorola Estate Action. Similarly, administrative creditors would not be paid if the Estate was unsuccessful against the Lenders. Further, as noted at the Settlement hearing, having a well-funded litigation trust was preferable to attempting to procure contingent fee-based representation.
 
 
 38
 The record does not explain, however, the Settlement's distribution of residual ILLLC funds to the Committee in violation of the absolute priority rule, and we will not speculate as to what reasons the Committee or the Lenders may offer for this deviation. Flexibility in crafting pre-plan settlements has its costs. The Committee has a fiduciary duty to maximize their recovery of the Estate's assets. See Shaw & Levine v. Gulf & Western Indus., Inc. (In re Bohack Corp.), 607 F.2d 258, 262 n. 4 (2d Cir.1979); 1 Norton Bankr.L. & Prac.2d § 27:23 (2006). If in pursuit of that duty, it reaches a settlement that in some way impairs the rule of priorities, it must come before the bankruptcy court with specific and credible grounds to justify that deviation and the court must carefully articulate its reasons for approval of the agreement. That has not happened here. Indeed, no reason has been offered to explain why any balance left in the litigation trust could not or should not be distributed pursuant to the rule of priorities. Thus, we remand this matter to the bankruptcy court for that court to assess the justification for providing for a distribution of ILLLC funds to the junior creditors at the completion of the Motorola litigation. The settlement has the overwhelming approval of almost all the parties involved. Our remand is not a repudiation of that support—it seeks only clarification of why the settlement need require a possible deviation from the rule in one regard.[20]
 
 E. The Settlement Agreement is not a Sub Rosa Plan of Reorganization
 
 39
 The final issue is closely related to the parties' other arguments. Motorola contends that the Settlement Agreement is an impermissible sub rosa plan of reorganization. Under section 363(b) of the Code, "[t]he trustee, after notice and a hearing may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The trustee is prohibited from such use, sale or lease if it would amount to a sub rosa plan of reorganization. The reason sub rosa plans are prohibited is based on a fear that a debtor-in-possession will enter into transactions that will, in effect, "short circuit the requirements of [C]hapter 11 for confirmation of a reorganization plan." Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.), 700 F.2d 935, 940 (5th Cir.1983). In this Circuit, the sale of an asset of the estate under § 363(b) is permissible if the "judge determining [the] § 363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application." Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir.1983).[21]
 
 
 40
 Here, the bankruptcy court identified a proper business justification for the Settlement. By allowing the Lenders to take $92.5 million and redirect another $37.5 million to the ILLLC in exchange for the Committee dropping the challenge to the liens, the Committee has cleared the way for implementation of a reorganization plan. The Estate stands to gain significantly more from the action against Motorola than it might if it or the Committee were forced to fund the litigation themselves at some much later date. As the Lenders point out, Motorola did not object when other operational assets of the Estate were sold, including the entire satellite constellation. In short, the bankruptcy court did not err in concluding that the settlement of the dispute of the liens and other property had a proper business justification and was "a step towards possible confirmation of a plan of reorganization and not an evasion of the plan confirmation process."
 
 Conclusion
 
 41
 The district court's order of April 4, 2005, which affirmed the bankruptcy court's order approving the Settlement Agreement, is hereby VACATED and the case is REMANDED to the district court with instructions to remand the case to the bankruptcy court for proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 As the case caption above indicates, the debtors in this case are Iridium Operating LLC, Iridium Capital Corp., Iridium IP LLC, Iridium LLC, Iridium Roaming LLC, Iridium (Potomac) LLC, and Iridium Promotions, Inc. Except where the distinctions among these entities are relevant, they will be collectively referred to simply as "Iridium" or the "Estate."
 
 
 [2]
 JPMorgan Chase Bank, N.A. was formerly known as The Chase Manhattan Bank
 
 
 [3]
 As the district court noted:
 Prior to Motorola's spin-off of Iridium, Motorola and Iridium . . . executed an Operations and Maintenance Contract ("O & M Contract") dated July 29, 1993. The O & M Contract provided that Motorola would perform certain services in connection with the operation and maintenance of the Iridium System's space segment, including upgrading hardware and software necessary to maintain certain performance levels, in exchange for Iridium's payment of what Iridium claims was $2.89 billion over the five year period contemplated by the contract.
 In re Iridium Operating LLC, 285 B.R. at 825. A previous contract between Motorola and Iridium for $3.45 billion was for "design, construction and launch of the Iridium System's space-based components." Id. As of July 1999, Iridium had paid over $3 billion to Motorola.
 
 
 [4]
 Specifically, the Third Cash Collateral Stipulation contained the following language:
 
 
 [14]
 Payment of the Debt [$800 million borrowed on December 23, 1998] is subject to no offsets, claims or counterclaims; the separate liens and security interests encumbering the Collateral securing the Debt are each valid, enforceable and perfected; and the payments made to [Chase and Lenders] pursuant to this Stipulation and Order are not subject to recharacterization
 
 
 [5]
 The rest of paragraph 14 read as follows:
 In addition to the Debtors, this paragraph 14 shall be binding and effective upon all parties in interest, including but not limited to any Committee unless: (i) a party in interest (but only such party) has filed an adversary proceeding within 90 days after the appointment of a Committee (except that the Committee shall have 150 days within which to file such a proceeding), without further extension unless [Chase] extends said date, against [Chase] and/or the Lenders with respect to the Debt, the extent of any diminution of Company Collateral, the characterization of the payments made hereunder, or the liens, security interests and pledges of and to [Chase], held for the benefit of the Lenders, securing the Debt; and (ii) the Court rules in favor of the plaintiff in any such adversary proceeding.
 The language of the Third Cash Collateral Stipulation was substantially similar to language contained in the cash collateral stipulations entered on September 13, 1999; October 13, 1999; March 6, 2000; March 20, 2000; and May 1, 2000.
 
 
 [6]
 As the Committee later explained to the bankruptcy court, having a well-funded litigation trust was preferable to attempting to procure contingent-fee based representation
 
 
 [7]
 The "Motorola-related litigation" actually includes several causes of action including the Motorola Estate Action (estate claims against Motorola); the Motorola Creditor Action (class action suit on behalf of the creditor class); and the Lenders' own claims against Motorola. Although the Settlement parses them out, we will refer to all the causes of action as simply the litigation against Motorola
 
 
 [8]
 Motorola claims to be owed approximately $1.3 billion under the various Iridium-Motorola contracts, including a $22.5 million post-petition loan and $675 million in expenses associated with the post-petition operation of the Iridium System
 
 
 [9]
 For example, "[p]erfection of security interests in satellite assets is an issue that courts have not generally faced."
 
 
 [10]
 Prior to its appeal to the district court, Motorola sought, and was denied, an emergency stay of the approval of the Settlement pending its appeal to the district court
 
 
 [11]
 The district court held that Motorola was judicially estopped "from questioning the validity of the Lenders' liens, or objecting to how the [cash] is distributed because it is inconsistent with Motorola's position in signing the Third Stipulation approved by the Bankruptcy Court."In re Iridium, 2005 WL 756900, at *5. The Committee and Lenders argue that this Court, too, should judicially estop Motorola from challenging any aspect of the liens or contesting the distribution of any part of the $137 million.
 Application of the doctrine is unwarranted here. Motorola's position does not rest on a contention that the liens are in fact invalid, but rather that right up until (and indeed dependent on approval of) the Settlement, there remained significant doubts as to the whether the liens were avoidable under the Bankruptcy Code based on the Committee's court-approved challenge to those purported liens.
 
 
 [12]
 Section 541 of the Bankruptcy Code defines "property of the estate" to include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1)
 The bankruptcy court's order approving the Settlement reads, in part, as follows: "To the extent provided for in the Settlement Agreement, the liens held by [the Lenders] are validated and are conclusively deemed to be senior, valid, perfected, enforceable and unavoidable and not subject to offsets, defenses, claims or counterclaims by the Estate[] and not subject to any other lien." (emphasis added). The district court echoed this conclusion when it noted that "[a]s part of the Settlement Agreement, the security interests of the previously contested liens of the Lenders were validated." In re Iridium, 2005 WL 756900, at *2 (footnote omitted). Further, the Committee's own motion for approval of the Settlement describes the money held by the Lenders as an "asset[ ] of the Estate[ ]."
 
 
 [13]
 The bankruptcy court's articulation of Rule 9019's standard for evaluating a settlement is a legal issue subject tode novo review. We review for abuse of discretion the reasonableness of that court's application of the Rule in approving the Settlement. In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 292 (2d Cir.1992).
 
 
 [14]
 See Reynaldo Anaya Valencia, The Sanctity of Settlements and the Significance of Court Approval: Discerning Clarity from Bankruptcy Rule 9019, 78 OR. L. REV. 425, 435 (1999).
 
 
 [15]
 InTMT Trailer Ferry, the Supreme Court held that
 [t]here can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise[, including comparing the compromise] with the likely rewards of litigation.
 390 U.S. at 424-25, 88 S.Ct. 1157. See also Korngold v. Loyd (In re S. Med. Arts Co.), 343 B.R. 250, 255-56 (B.A.P. 10th Cir.2006) ("In the absence of any statutory guidance in the Bankruptcy Code as to how to evaluate the factual circumstances of compromises, many bankruptcy courts have looked for guidance from [TMT Trailer Ferry.]").
 
 
 [16]
 Under the Code, a class is "impaired under a plan unless, with respect to each claim or interest of such class, the plan . . . (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1)
 
 
 [17]
 The absolute priority rule originated as a "judicial invention designed to preclude the practice in railroad reorganizations of `squeezing out' intermediate unsecured creditors through collusion between secured creditors and stockholders (who were often the same people)."In re Wabash Valley Power Ass'n, 72 F.3d 1305, 1314 (7th Cir.1995). See also Harvey R. Miller & Ronit J. Berkovich, The Implications of the Third Circuit's Armstrong Decision on Creative Corporate Restructuring: Will Strict Construction of the Absolute Priority Rule Make Chapter 11 Consensus Less Likely?, 55 AM. U.L. REV. 1345, 1362-75 (2006); Douglas G. Baird & Thomas H. Jackson, Bargaining After the Fall and the Contours of the Absolute Priority Rule, 55 U. CHI. L. REV. 738, 739, 746 (1988).
 
 
 [18]
 Courts often state that the purpose of review under the Rule 9019 factors is to determine whether a settlement is "fair and equitable," deriving this terminology, along with the factors themselves, fromTMT Trailer Ferry. In TMT Trailer Ferry, however, "fair and equitable" encompassed conformity with the absolute priority rule. See TMT Trailer Ferry, 390 U.S. at 441, 88 S.Ct. 1157 ("[A] bankruptcy court is not to approve or confirm a plan of reorganization unless it is found to be `fair and equitable.' This standard incorporates the absolute priority doctrine . . . .").
 The "fair and equitable" analysis using the Rule 9019 factors, however, does not assess whether a plan conforms to the absolute priority rule. This overlap in terminology obscures the question at issue here: whether a pre-plan settlement that is "fair and equitable" under the Rule 9019 factors must also conform to the absolute priority rule. For clarity, we reserve the phrase "fair and equitable," whenever possible, for the outcome of the analysis we describe, which makes the absolute priority rule the most important factor for courts to consider when deciding whether to approve a settlement under Rule 9019.
 
 
 [19]
 The sixth factor, "the nature and breadth of releases to be obtained by officers and directors," is not at issue in this case
 
 
 [20]
 We are also mindful that the district court denied Motorola's request for a stay of its order. The Motorola litigation therefore has been commenced and is on-going. It may well be that the litigation funds are now exhausted or nearly so. Thus, what was once hypothetical—the parties represented at oral argument that the funds would be dissipated—may now be fact. The bankruptcy court need not restrain the parties' proof to the circumstances extant at the time they originally applied for approval of the settlement
 
 
 [21]
 InLionel the Court listed a number of factors that a judge might consider when determining whether there is a "business justification" for the asset's sale. The non-exclusive list included:
 the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.
 In re Lionel Corp., 722 F.2d at 1071.