**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-1591
_____

In Re: ENERGY FUTURE HOLDINGS CORP., ET AL.,

Debtors

DELAWARE TRUST COMPANY f/k/a CSC Trust Company Delaware, as Indenture
Trustee,

Appellant

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
(D.C. No. 1-14-cv-00723)
District Judge: Hon. Richard G. Andrews
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
March 23, 2016
_____

Before: GREENAWAY, JR., VANASKIE, and SHWARTZ, Circuit Judges.
(Filed: May 4, 2016)

_____

OPINION[*]
_____

SHWARTZ, Circuit Judge.

_____

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

Debtor Energy Future Holdings Corp. ("EFH") and its subsidiaries, including Energy Future Intermediate Holdings Corp. ("EFIH") (collectively, "Debtors"), with the approval of the Bankruptcy Court, settled claims with certain creditors holding notes secured by a lien on Debtors' assets. Delaware Trust Company, as indenture trustee (the "Trustee"), asserts that the settlement involved a tender offer that is impermissible in bankruptcy and that the settlement violates core principles of the bankruptcy process. Because the settlement was consistent with bankruptcy law, we will affirm.

I

Debtors comprise the largest electrical energy company in Texas. Their creditors included EFIH noteholders. Each note was governed by an indenture and some were secured by a first lien on Debtors' assets (the "First Lien Notes"). One set of the First Lien Notes represents a principal amount of $500 million with an interest rate of 6 7/8%, due in 2017 (the "6 7/8% Notes"). The other set of Notes represents a principal amount of approximately $3.5 billion with an interest rate of 10%, due in 2020 (the "10% Notes"). Each indenture contains a provision providing for a "make-whole" premium, which would "compensate noteholders for the loss of future interest resulting from an early refinancing." Appellant's Br. 9. Thus, the make-whole premium would require Debtors to make additional payments to the First Lien Noteholders if the Notes were redeemed before their final maturity.

Debtors sought to restructure this debt in 2012 and began negotiating with creditors, including some of the First Lien Noteholders. Following almost two years of negotiation, Debtors and several large creditors, most notably Pacific Investment

2

Management Company ("PIMCO"), Western Asset Management Company ("WAMCO"), and Fidelity Investments ("Fidelity"), agreed to a Restructuring Support Agreement ("RSA"), initially intended to accomplish a "global restructuring" of the Debtors' entities and debt. Although the idea of a global restructuring was eventually abandoned, under the RSA, these entities agreed to refinance the First Lien Notes, release any claim to a make-whole premium, and provide additional financing.[1]

Because the RSA did not resolve all of their financial problems, Debtors filed for bankruptcy under Chapter 11 in the United States Bankruptcy Court for the District of Delaware.[2] One week after filing their bankruptcy petition, Debtors initiated what the parties have labeled a "tender offer" directed to the First Lien Noteholders that embodied certain terms set forth in the RSA. The goal of this offer was to settle disputes with all First Lien Noteholders.

The offer was to remain open for thirty-one days, and offered each First Lien Noteholder 105% of the Notes' principal amount and 101% of the accrued interest in exchange for the release of any potential claim to the make-whole premium. The offer contained a "step down" procedure, reducing the principal premium from 5% to 3.25% after fourteen days. The offer notified the First Lien Noteholders that the offer was

---

[1] These creditors also provided additional debtor-in-possession financing and negotiated a "Most Favored Nations" provision, which provided that if any creditor later received a recovery higher than the amount specified in the RSA before "EFIH First Lien DIP Financing is fully funded pursuant to a final order entered by the Bankruptcy Court," the RSA would be immediately adjusted to provide the same recovery. JA 552**.**

[2] On the petition date, Debtors also moved for approval of the loans and refinancing of the First Lien Notes, and sought a ruling that no make-whole premiums were payable.

subject to Bankruptcy Court approval and that Debtors intended to initiate litigation to disallow the make-whole premium claims.[3] Under the make-whole provision, due to the lower interest rate and earlier redemption date, the 6 7/8% Noteholders' make-whole premium would have been smaller than that of the 10% Noteholders. Thus, under the terms of the offer,, holders of the 6 7/8% Notes would receive a greater percentage of a possible recovery for the make-whole premium than the 10% Noteholders.

Ultimately, 97% of the 6 7/8% Noteholders accepted the offer, while only 34% of the 10% Noteholders did so. Noteholders who declined the offer retained their full claim and the right to litigate and obtain full value for their make-whole premium.

Nine days after initiating the offer, Debtors filed a motion for approval of the settlement pursuant to 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 9019. The Trustee, on behalf of the non-settling First Lien Noteholders, objected to Debtors' request for approval of the settlement. Following a hearing at which it heard testimony about the benefits of the settlement, including that the offer would save the estate over ten million dollars each month in interest payments, the Bankruptcy Court approved the settlement, holding that there were no "incidents of discriminatory treatment" in the Debtors' approach to settlement and that the plan was a proper use of estate assets. JA 169. The District Court affirmed the Bankruptcy Court's approval order. The Trustee appeals.

II[4]

---

[3] The Bankruptcy Court has since disallowed the make-whole premium. This ruling is the subject of a separate appeal.

[4] The District Court had jurisdiction over the bankruptcy appeal under 28 U.S.C. § 158(a)(1). We exercise appellate jurisdiction over the appeal from the District Court's

4

A

A bankruptcy court has the authority to "approve a compromise or settlement" of a claim "after notice [to the debtor, trustee, and creditors] and a hearing" on the compromise. Fed. R. Bankr. P. 9019(a). The bankruptcy court must then decide whether the settlement is "fair and equitable," In re Nutraquest Inc., 434 F.3d 639, 644 (3d Cir. 2006) (quoting Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)), and "assess and balance the value of the claim that is being compromised against the value to the estate of . . . accept[ing] . . . the compromise" by considering: "(1) the probability of success in ligation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." In re Martin, 91 F.3d 389, 393 (3d Cir. 1996).

In this case, the Trustee challenges the conclusion that the settlement is fair and equitable. In short, it asserts that use of tender offers as a means to settle claims is

---

final order pursuant to 28 U.S.C. §§ 158(d)(1) and 1291. We review findings of fact made by the bankruptcy court for clear error, and review questions of law de novo. Lebron v. Mechem Fin. Inc., 27 F.3d 937, 942 (3d Cir. 1994). We review the approval of a settlement for an abuse of discretion. In re Nutraquest, Inc., 434 F.3d 639, 644 (3d Cir. 2006). Under this standard,

> [w]e do not disturb an exercise of discretion unless there is a definite and firm conviction that the court . . . committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors. Put another way, for us to find an abuse of discretion[,] the . . . decision must rest on a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact.

Id. at 645 (alteration in original) (internal citation and quotation marks omitted).

5

impermissible under Chapter 11. It also argues that the offer violates the equal treatment principle. Finally, it contends that the settlement constituted an impermissible sub rosa plan. We will address each argument in turn.

A

Although the parties have called the arrangement here a "tender offer," in this case it was simply a means to convey a settlement offer to certain creditors who were expected to make claims against the assets of the bankruptcy estate.

Under 11 U.S.C. § 363(b), a debtor may use estate property outside the ordinary course of business, upon notice and a hearing, to settle claims with the approval of the bankruptcy court. Northview Motors, Inc. v. Chrysler Motors Corp., 186 F.3d 346, 350 (3d Cir. 1999); see Fed. R. Bankr. P. 9019 (providing for bankruptcy court approval of settlements). The bankruptcy court is charged with ensuring that such settlements are "fair and equitable." See Martin, 91 F.3d at 393 (citation omitted). Of course, this includes confirming that the proposed settlement does not contravene the Bankruptcy Code.

To the extent the offer allowed noteholders to receive payment in exchange for abandoning their make-whole claims constitutes a type of "tender offer," it clearly did not violate the Bankruptcy Code. The "tender offer" here was merely a mechanism to communicate the settlement offer. It detailed the proposed terms of the offer, set forth the reasons for the offer, explained the dispute over make-whole premiums and informed creditors of Debtors' intention to litigate the validity of the claims, disclosed associated risk factors, and notified all offerees that the settlement was subject to court approval.

Practically speaking, the "tender offer" in this case was equivalent to a detailed settlement memorandum in any other case.

Moreover, the Trustee has failed to identify any section of the Bankruptcy Code that forbids settlements using a tender offer process.[5] All of the code sections on which the Trustee relies relate to reorganization plans, such as § 1125 (requiring court approval for solicitation of a plan), § 1126(c) (providing for class voting on plans), and § 1128 (plan confirmation), and "class-based" procedures for negotiation inherent to the bankruptcy process. None of the sections apply to court-approved settlements entered before the plan confirmation process has begun. Thus, there is nothing to show the use of such a process contravenes the Bankruptcy Code.

Having concluded that the settlement offer here did not violate the Code, we next examine whether the Bankruptcy Court acted within its discretion in approving the settlement. We conclude that it did.

The Bankruptcy Court's decision reflects thorough consideration of the Martin factors concerning the complexity of the litigation over the make-whole claims and the delays associated with such a suit. The EFH bankruptcy is large and complicated. The

---

[5] Indeed, as the parties note, the tender offer process has been used to settle claims in other bankruptcy cases. See In re Standard Oil & Expl. of Del., Inc., 136 B.R. 141, 144-53 (Bankr. W.D. Mich. 1992); see also In re AMR Corp., 485 B.R. 279 (Bankr. S.D.N.Y. May 23, 2013); In re Eastman Kodak Co., 479 B.R. 280 (Bankr. S.D.N.Y. Dec. 19, 2012). The Trustee argues that the tender offers in these cases are inapposite comparisons because the debtors there sought approval from the Bankruptcy Court prior to launching their tender offer. While pre-launch approval may be preferable where possible, we see no reason to hold that the order of events dictates whether a settlement achieved by a tender offer is fair and equitable. The Bankruptcy Court retains the discretion to determine whether the circumstances and timing surrounding an offer undermine its fairness.

parties were well aware of the likelihood of protracted litigation regarding the recovery on the make-whole premiums. Thus, the settlement offer significantly reduced the "complexity and inconvenience" of the litigation. Nutraquest, 434 F.3d at 646.

The Martin factor concerning the fairness to creditors also supported approving the settlement. The settlement here provided each First Lien Noteholder the ability to recover the same proportion of its principal and accrued interest, and made clear Debtors' intent to challenge the validity of the make-whole premiums, placing each creditor on notice that its entitlement to such a premium might be eliminated in full. The settlement further detailed numerous risk factors related to the bankruptcy proceeding. In addition, it provided that a noteholder who chose not to settle preserved its claim at the same level of priority. Finally, the settlement immediately saved the estate millions of dollars each month and thus provided more assets to satisfy all creditors.[6]

---

[6] Despite these benefits, the Trustee argues with some force that the nature of the settlement's rollout undermines its overall fairness. Only select creditors participated in the initial negotiations, and the offer was released within a week of the bankruptcy petition's filing. In addition, the offer was conveyed without prior Bankruptcy Court approval, and the step-down provision required noteholders to decide very quickly whether to sign on or risk their premium payment dropping from 5% to 3.25% fourteen days after the tender offer's initiation. Under the framework of In re Jevic Holding Corp., 787 F.3d 173 (3d Cir. 2015), this kind of behavior may undermine the equity of a settlement, because creditors may not have an adequate opportunity to assess their options and decide whether to accept a settlement. If the detriment to non-settling creditors is sufficient, it may also indicate that the settlement should not be approved under Martin. Nutraquest, 434 F.3d at 647 (discussing the Martin requirement that the settlement be in the interest of creditors). On balance, however, this settlement was fair and equitable.
The vast majority of First Lien Noteholders were sophisticated financial entities, and there is no indication that any creditor was misled or denied the chance to negotiate or participate in the settlement process. Finally, although bankruptcy court approval should generally be sought at the earliest time possible, the offering memorandum clearly

In sum, the offer here is not precluded by the Bankruptcy Code[7] and the Bankruptcy Court acted within its discretion to approve the offer as a means to settle certain claims against the estate.

B

We next address the Trustee's contention that because holders of the various First Lien Notes received different percentages of the potential full value of the make-whole premiums, the settlement violates the Bankruptcy Code's "equal treatment" rule, 11 U.S.C. § 1123(a)(4).

Section 1123(a)(4) embodies the principle that all similarly situated creditors in bankruptcy are entitled to equal treatment. However, under its plain language, the provision applies only to a plan of reorganization, and therefore not to pre-confirmation settlements. See id. Supreme Court precedent and the Bankruptcy Code itself allow for settlements to be reached outside of the confirmation process. See TMT Trailer Ferry, 390 U.S. at 424; Fed. R. Bankr. P. 9019. Thus, we must read the Code's requirements together with the recognition of the importance of compromise in bankruptcy. See

---

detailed the terms of the settlement, associated risks, and the need for court approval, and hence provided sufficient notice of its terms. Thus, the pre-approval activities do not undermine our conclusion that the Bankruptcy Court did not abuse its discretion in holding that the settlement was fair and equitable.

[7] This is not a blanket endorsement of all tender offers in bankruptcy. Rather, like other means for achieving settlements in a bankruptcy case, each tender offer must be reviewed on a case-by-case basis. See In re Allegheny Int'l, 118 B.R. 282, 295-96 (Bankr. W.D. Pa. 1990) (rejecting a tender offer used to circumvent bankruptcy procedures). Any danger with a tender offer results from the specific offer itself and how it is used, and not from an inherent problem with tender offers as a means to settle bankruptcy claims.

Nutraquest, 434 F.3d at 645; 9 Collier on Bankruptcy ¶ 9019.01 (16th ed. rev. 2015)

("Compromises are favored in bankruptcy.").

As we observed in In re Jevic Holding Corp., 787 F.3d 173 (3d Cir. 2015), petition

for cert. filed, 84 U.S.L.W. 3285 (U.S. Nov. 16, 2015) (No. 15-649),[8] core bankruptcy

principles, such as the absolute priority rule and the equal treatment rule, see In re W.R.

Grace & Co., 729 F.3d 332, 343 (3d Cir. 2013), which apply in the plan confirmation

process, are not categorically applied in the settlement context. Instead, we adopted a

flexible approach that permits the approval of settlement that may not comply with such

rules so long as the bankruptcy court "ensur[es] the evenhanded and predictable treatment

of creditors." Jevic, 787 F.3d at 178. This does not mean, however, that such rules can

be ignored. Indeed, a settlement's fidelity to the requirements of the Bankruptcy Code

will generally be the most important factor in determining whether a settlement is fair and

equitable. Id. at 184.

Even though Jevic teaches that a bankruptcy court has latitude in declining to

apply confirmation plan rules in connection with settlements, it makes clear that a

bankruptcy court cannot disregard the central tenets of the bankruptcy system. See id. at

180-85. When a debtor files its petition, it enters into a process in which a bankruptcy

court is responsible for both protecting estate assets and the interests of the creditors. As

to creditors, a bankruptcy court is obligated to ensure that the creditors are treated in an

---

[8] On February 29, 2016, the Supreme Court invited the Solicitor General to file a brief expressing the views of the United States. 577 U.S. __, available at http://www.supremecourt.gov/orders/courtorders/022916zor_7lho.pdf (last accessed Mar. 3, 2016)

"evenhanded and predictable" fashion, both in and outside of the settlement context. Id. at 184. Thus, it "may approve settlements that deviate" from treating similarly situated creditors equally "only if [it] ha[s] 'specific and credible grounds to justify the deviation." Id. (quoting In re Iridium Operating, LLC, 478 F.3d 452, 466 (2d Cir. 2007)). We must therefore decide whether there has been a deviation from the equal treatment rule here, and, if so, whether the Bankruptcy Court had adequate reasons for doing so.

A review of the record demonstrates that the Bankruptcy Court properly concluded that there was in fact equal treatment. First, each First Lien Noteholder was offered 105% of the principal note amount, and 101% of the accrued interest. Thus, each Noteholder was offered the same percentage of both principal and accrued interest. Second, each was offered the opportunity to retain its rights to seek a "make whole remedy." Thus, any Noteholder who chose not to settle maintained its entire claim against the estate, fully secured by the estate's assets.

Unlike Jevic, wherein the settlement barred an entire class of creditors from relief, no group of eligible creditors was deprived of the opportunity to participate. Thus, the settlement offer presented each First Lien Noteholder with a choice and left each to decide whether the potential to recover the make-whole premium in full was worth foregoing a guaranteed premium payment upon settlement. This is all that the Bankruptcy Code requires. W.R. Grace & Co., 729 F.3d at 327 ("[C]ourts have interpreted the same treatment requirement to mean that all claimants in a class must have the same opportunity for recovery." (internal quotation marks omitted)).

11

Although the settlement offer results in differing outcomes when viewed through the lens of the total potential recovery on the make-whole premium, mere differences in potential final outcomes resulting from choices made by individual creditors do not violate the equal treatment protections of § 1123(a)(4). <u>See</u> <u>In re Wash. Mut., Inc.</u>, 442 B.R. 314, 355 (Bankr. D. Del. 2011) (citing <u>In re Dana Corp.</u>, 412 B.R. 53, 62 (S.D.N.Y. 2008)). As the Bankruptcy Court observed, "it certainly isn't unfair discriminatory treatment when we look at simply the fact of the difference between the realization on what the make[-w]hole premium might or might not be."[9] JA 169-70.

Finally, the settlement does not negatively impact the uninvolved creditors and, in fact, actually helps them. It is undisputed that the proposal, the settlement allowed the estate to save well over ten million dollars each month in interest payments. As a result, many junior creditors supported and benefitted from the settlement because the savings increased the amount of money available to satisfy lower priority claims.

For these reasons, the settlement is not inconsistent with the equal treatment rule.

C

Finally, the Trustee contends that the pre-petition arrangement with PIMCO, WAMCO, and Fidelity and the settlement offer constitute an improper <u>sub rosa</u> plan. When a transaction or settlement in bankruptcy has the effect of "dictating some of the terms of any future reorganization plan," a court deems the transaction impermissible

---

[9] The Bankruptcy Court also noted that PIMCO, WAMCO, and Fidelity received some additional consideration, such as the most favored nations clause, but this was not discriminatory, because those creditors provided additional benefits to the estate through backstop funding commitments and additional financing.

12

because it "short circuits the requirements of Chapter 11 . . . by establishing the terms of the plan <u>sub rosa</u> in connection with a sale of assets." <u>Jevic</u>, 787 F.3d at 187 (Scirica, J., concurring in part and dissenting in part) (quoting <u>In re Braniff Airways, Inc.</u>, 700 F.2d 935, 940 (5th Cir. 1983)). The "hallmark of such a plan is that it dictates the terms of a reorganization plan." <u>Id.</u> at 188.

The settlement here does not constitute a <u>sub rosa</u> plan. Outside of the settling noteholders, there is no indication, and the Trustee has provided no evidence showing, that any other creditor's recovery is impacted by the settlement, or that any requirement of Chapter 11 is subverted by the plan. Because the settlement neither subverts the bankruptcy process nor impermissibly dictates the outcome to other creditors, it is not a <u>sub rosa</u> plan.

III

For the foregoing reasons, we will affirm.